ANNA IRENE PAINE v. GAMBLE STORES, INC. AND ANOTHER.
O'BRIEN MERCANTILE COMPANY, APPELLANT.[1]

April 14, 1938.

No. 31,466.

[1]Reported in 279 N. W. 257.

*Cobb, Hoke, Benson, Krause & Faegre, Raymond A. Scallen,* and *Wright W. Brooks,* for appellant.

*Ryan, Ryan & Ryan,* for respondent.

HILTON, JUSTICE.

Plaintiff, as administratrix of the estate of her deceased husband, Ray H. Paine, brought this action to recover damages for his death. She secured a verdict for $10,000 against the O'Brien Mercantile

Company, hereinafter referred to as the defendant, and it appeals from an order denying its alternative motion for judgment notwithstanding the verdict or a new trial.

Mr. Paine's lifeless body was discovered early in the morning of July 12, 1936, in an areaway at the foot of a stairway which descended to a basement entrance of a building in the city of Brainerd, Minnesota. This building was owned by the defendant. The main floor was occupied by the Skauge Drug Company, which had leased the ground floor and basement from the defendant for some 25 years prior to the time of Mr. Paine's death. A renewal of this lease, dated August 1, 1935, had been executed on February 1, 1936. The basement was occupied by Gamble-Skogmo, Incorporated, by virtue of a sublease from the Skauge Drug Company.

The building faces north and adjoins the west side of an alley which runs north and south between Laurel street and Maple street. The basement stairway was on the alley side of the building and created a large and deep opening at ground level. This opening was protected on one side by the building. At the head of the stairs, which descended toward the south, was a gate made of iron pipe. Double rails made of similar piping had extended from the gate, along the alley side of the opening to the southeast corner thereof, and thence to the building. It is undisputed that when Mr. Paine's death occurred the top rail extending from the building to the southeast corner of the opening, the top part of the corner-post, and a portion of the top rail extending from this corner toward the gate were missing. According to the estimates of various witnesses, the railing had been in this condition for a period of from two months to a year. We shall forego at this point further mention of the evidence relating to the circumstances surrounding Mr. Paine's death and discovery of his body, as it will be necessary to discuss such evidence in connection with an assignment of error to be considered hereinafter.

Plaintiff joined the defendant and Gamble Stores, Incorporated, alleging that the latter occupied the basement of the building as a tenant. The Skauge Drug Company and Gamble-Skogmo, Incorporated, were not made parties. The complaint alleged that Mr.

Paine's death was the result of negligence in maintaining the stairway and opening in an insufficiently protected condition. The jury returned a verdict in favor of Gamble Stores, Incorporated, the evidence showing that it had no interest in Gamble-Skogmo, Incorporated, and found against the defendant, as already stated.

■ By terms of the lease, the lessee and not the defendant covenanted to make repairs, and the plaintiff concedes that if this were the only provision in the lease referring to repairs defendant would not be liable to third persons for damages caused by a dangerous condition arising on the premises during the term of the lease. However, the lease also reserved a right of entry to the defendant for the purpose of making repairs, alterations, and improvements, and our first inquiry is whether such a reservation of a right of entry has any effect on defendant's liability in this action. No question relating to knowledge or notice of the dangerous condition is involved.

While there are many decided cases in this jurisdiction dealing with the duties and liabilities of a lessor or lessee *inter se* and to third persons (see 4 Dunnell, Minn. Dig. [2 ed. & Supps. 1932, 1934, 1937] § 5369), none of the cases involved a lease reserving a right of entry for the purpose of making repairs, except Keegan v. G. Heileman Brg. Co. 129 Minn. 496, 152 N. W. 877, L. R. A. 1916F, 1149. In that case the action was brought by a person in privity with the lessee to recover for injuries sustained while on the property itself, and it is therefore not in point. We are not here concerned with the lessor's duties or liability to anyone on the property by virtue of the lease or at the lessee's invitation.

The learned trial judge adopted the law as laid down in Appel v. Muller, 262 N. Y. 278, 186 N. E. 785, 89 A. L. R. 477, and instructed the jury accordingly. It was held in the cited case that a lessor who had reserved a right of entry for the purpose of making repairs was liable to a member of the public injured by a dangerous condition on the property while using an abutting public sidewalk. Although that case has been criticized (18 Minn. L. Rev. 229, 230), we think it represents the correct view. See also, 47 Harv. L. Rev. 357.

It is elementary, of course, that the owner of real property owes a duty to the public to maintain his premises in such a condition as not to render the use of abutting public ways unsafe or dangerous. Unlike the duty owed to the lessee and those in privity with him who come on the premises, it exists entirely independent of a covenant in a lease. It is a duty based on control of the property.

When the owner leases the property in sound condition and the lessee covenants to repair (or the lease is silent about repairs), the lessor is relieved of this duty for the term of the lease. Nickelsen v. M. N. & S. Ry. 168 Minn. 118, 209 N. W. 646. Having surrendered the entire control over the property without reservation of a right of entry expressly or by implication, he cannot go upon the property for the purpose of investigation to determine the necessity for repairs, or to make them (4 Dunnell, Minn. Dig. [2 ed. & Supp. 1932] § 5365), and thus the correlative duty to maintain the premises in repair is suspended. But when the lease, either by covenant to repair, which by implication gives the lessor a right of entry for the purpose of making repairs (Barron v. Liedloff, 95 Minn. 474, 104 N. W. 289), or by an express reservation of a right of entry for that purpose, retains sufficient control in the lessor to enable him to make repairs, the duty owed to users of abutting property is not suspended because he has the power to perform his obligation and the reason for otherwise suspending it is gone. See 35 Harv. L. Rev. 633, 638, note 10. This is the line of reasoning adopted by the court in Appel v. Muller, 262 N. Y. 278, 186 N. E. 785, 89 A. L. R. 477, and it is sound.

What has been said disposes of the suggestion that although the owner's duty is based on control of the property, something more than a mere reservation of a privilege to enter and repair is necessary to constitute such control, and that there must be the power and right to admit people to the premises or exclude them therefrom. See 18 Minn. L. Rev. 229, 230. The owner's duty to members of the public using adjoining public ways is in no way associated with the right to say who may or may not go upon the property. The required degree of control is only that necessary to enable performance of the duty, and it makes no difference whether

the lessor's control over the premises enabling him to repair arises from a covenant on his part to repair or the mere reservation of a right of entry for that purpose. In principle, both situations are the same. Any provision which retains in the lessor power or ability to perform the duty is sufficient to prevent its suspension. He then has the control upon which the duty is based.

A detailed analysis of the authorities is not warranted. Many are collected in an annotation in 89 A. L. R. 480. On the liability of the lessor generally to persons outside the premises, see 50 L.R.A.(N.S.) 286; 92 A. S. R. 499; 26 Mich. L. Rev. 531.

■ The defendant contends that plaintiff failed to prove that Mr. Paine's death was proximately caused by the defective condition of the railing, and that the manner in which he met his death is wholly speculative and conjectural. Deceased, an alderman of the city of Brainerd, left his home about two o'clock in the afternoon of July 11, 1936, to take his two daughters to work. As far as the evidence reveals, he was not seen again after he left them until his body was discovered at the bottom of the pit about 6:30 a. m. the following morning. To use the language of one witness in describing the position of the body, it "was lying in a southwesterly direction, that is, the head was pointed in a southwesterly direction, with the whole body and legs folded over the head so his head was almost obscured underneath his legs; he was lying on his shoulders and head, and his body doubled up in jackknife fashion." Examination of a photograph taken before the body was moved indicates that this description is about as definite as it can be made.

The body lay directly below the place where the top rail was missing. The remaining rail at that point was only about "knee high" from the ground. Two police officers who were witnesses for the plaintiff examined the premises following discovery of the body, and their testimony was substantially in agreement. The body was discovered by one of these officers, and he testified that he examined the steps and found them covered with an accumulation of dust and dirt which was entirely undisturbed. The other testified that he reached the scene some time later and also made a close examination

of the steps, but discovered no disturbance of the dust thereon except for footprints directly in the center of the steps, which were probably those of his fellow officer. Both officers also testified that they found a perpendicular scratch, which appeared to be freshly made, on the wall of the pit. This scratch was about eight inches below ground level and seven or eight feet above the bottom of the pit. The setting of a ring on the left hand of the body was missing, and the prongs of this ring which had held the setting in place were also scratched. These circumstances tend to show that the scratch on the wall was made by the ring during the course of the fall. If such was the jury's conclusion, and considering the location of the scratch, there would seem to be little doubt but that deceased fell into the pit over the remaining lower rail.

In addition to the evidence mentioned, there is testimony tending to show that deceased had a weak left leg which sometimes gave out, and that at such times he had to grasp something to keep from falling.

Plaintiff was necessarily confined to circumstantial evidence in the proof of proximate cause, but she has met the requirements which apply in such a case. The jury's finding that deceased's fall was occasioned by the defective railing is supported by an inference which, in view of the evidence, is clearly reasonable, and this is sufficient. "It is only where the inference upon which the challenged finding rests is not itself reasonably supported or where it is clear that the whole evidence is in manifest and undeniable preponderance against it (even though there is some support for it in the evidence) that there should be a reversal." Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 442, 215 N. W. 678, 679. The following language from Gross v. General Inv. Co. 194 Minn. 23, 27, 259 N. W. 557, 559, is of peculiar application:

"It is not absolutely necessary for plaintiff to prove the precise manner in which Gross came to fall into the pit. He did fall in; and if any of the alleged negligent acts or omissions of defendants have been proved which reasonably may be found the cause of the fall and the resulting death, the verdict must be sustained."

Plaintiff, of course, had the affirmative on the issue of proximate cause, and the burden of proof rested on her. Had she failed to produce evidence either way, or a preponderance of proof for the affirmative, the negative would automatically prevail, even though supported only by conjecture or mere possibility. Maher v. Duluth Yellow Cab Co. *supra.* The defendant seems to have taken the unwarranted position, however, that plaintiff was bound to eliminate all possible causes of deceased's fall and death other than those for which it would be responsible. We have expressly adopted the rule that in a civil case circumstantial evidence need not exclude every reasonable conclusion other than that arrived at by the jury. Sherman v. Minnesota Mut. L. Ins. Co. 191 Minn. 607, 255 N. W. 113.

"If the circumstantial evidence was 'something more than consistent' with plaintiff's theory, if it furnished a reasonable basis for the inference by the jury of the ultimate fact that the alleged negligence was the cause of the injury complained of, it is sufficient proof of the causal connection to sustain a verdict. *Plaintiff was not bound to negative all possible circumstances which would excuse the defendant.*" (Italics supplied.) Mitton v. Cargill Elev. Co. 124 Minn. 65, 71, 144 N. W. 434, 436 (*Id.* 129 Minn. 449, 152 N. W. 753).

The defendant suggests several "possibilities," and perhaps more could be added with but little effort. Nevertheless, having determined that the evidence furnishes a reasonable basis for the jury's finding of proximate cause, the verdict must stand unless there is a manifest and undeniable preponderance to the contrary, and in this respect it is evident that the preponderance is with the affirmative and not the negative. The suggested "possibilities" are not entitled to much weight for they amount to little more than speculation and conjecture, and for the most part are opposed to more positive and persuasive evidence. In the absence of supporting evidence much stronger than that disclosed by the record now before us, they certainly cannot be said to establish a preponderance contrary to the inference upon which the verdict is based.

Furthermore, plaintiff's evidence does go a long way toward eliminating possible causes other than the one upon which her case is based. Opposed to the suggestion that deceased may have been the victim of an attack by some third person is the testimony of one of the police officers that he closely examined the ground around the pit for possible signs of scuffling and was unable to find any evidence of a struggle having occurred. Deceased was a large man, weighing about 180 pounds. Apparently there were no marks of violence upon the body, and it is extremely unlikely that deceased could have been pushed or thrown into the cellarway without resisting the assault. Had this occurred, it would seem that there would have been some evidence of violence or a struggle.

Because deceased was ill shortly before his death and had been treated for a heart condition, it is suggested that his fall or death may have been the result of a heart attack. The only evidence to support this theory is the inference which might be made from the fact of the illness and heart trouble. It was admittedly a possibility, but at most was only an inference opposing that supporting the affirmative, and it was for the jury to determine its weight and choose between the conflicting inferences. For the plaintiff, there was evidence that deceased was much improved from his illness at the time of his death. He had, to some extent, resumed his normal everyday activities. The death certificate which was put in evidence listed the cause of death as a broken neck at the fourth vertebra. In the light of these circumstances, it is not difficult to understand why the jury rejected this suggestion.

Defendant calls attention to the fact that the gate at the head of the stairway was ajar when the body was found, and argues that it is therefore just as consistent with the facts to infer that deceased fell down the stairs as to conclude that he fell into the pit over the place where the rail was missing. However, it seems inconceivable that a man of Mr. Paine's size, or any person for that matter, could have fallen down the stairway without in any way disturbing the accumulation of dust on the steps. The argument that any marks left by such a disturbance may have been obliterated by dust which collected on the steps after Mr. Paine's fall is extremely weak and

not in the least persuasive. At most, the open gate was merely another circumstance to be considered by the jury with all the evidence heretofore mentioned, in determining the manner in which deceased met his death.

Our conclusion on this point is that the inference upon which the verdict is based is reasonable and not contrary to the preponderance of the evidence. Defendant's contention is therefore without merit.

■ Defendant assigns error on the admission of mortality tables in evidence on the ground that such tables are based on the lives of persons in sound and normal health, and that deceased was not the type of person contemplated by these tables because he was in poor health when he was killed.

Mr. Paine was manager of a creamery in Brainerd. As already indicated, he had been ill for some time prior to his death. The only evidence relating to the nature of this illness was the testimony of the plaintiff. She stated that he had been ill and away from work for about six months prior to the accident and had been treated for "some heart condition." She also testified that he had improved and was up and around prior to his death. He had started going to the creamery for a few hours every day to take care of the books, but did not engage in manual labor.

In Norris v. Detroit United Railway, 193 Mich. 578, 160 N. W. 574, it was held that the admission of mortality tables is erroneous where, in a personal injury case, the plaintiff was not in average physical health and vitality at the time of injury. This case was later approved in Fortner v. Koch, 272 Mich. 273, 261 N. W. 762. While a few courts seem to have adopted a similar view, the overwhelming weight of authority is to the contrary.

"While the probative effect of mortality tables may be impaired or destroyed, they are not rendered inadmissible by evidence of disease or ill health on the part of the person to whom they are applied, * * * Although the standard tables are not strictly applicable on account of the difference between the lives on which they are based and the life of one in ill health * * *, yet they are more or less efficient aids in arriving at an approximation of

the truth, and that is the best that can be hoped for, after all. They cannot be objected to as misleading because of the health \* \* \* of the subject, if the jury are informed that the tables represent the expectancy of a man in good health \* \* \*." 19 R. C. L. p. 217, § 3. See also, 4 Jones, Commentaries on Evidence (2 ed.) pp. 3194, 3197, § 1743.

In the first case from this jurisdiction on this general subject, the court stated (Scheffler v. M. & St. L. Ry. Co. 32 Minn. 518, 521, 21 N. W. 711, 712):

"Such tables are, however, not conclusive, for there is not only a considerable variance in different tables, but they are not so compiled as to show the probable duration of life under any and all circumstances, but under particular conditions, *so that their evidentiary value in a given case is largely analogical.*" (Italics supplied.)

The defendant relies strongly upon Butler v. Butler, 180 Minn. 134, 230 N. W. 575, in which at first impression the Michigan rule seems to have been approved. However, an examination of the case and consideration of the authorities and the general principles involved has led us to the conclusion that the language there used should be limited to the facts involved. The person whose life expectancy was the subject of inquiry was actually dying. Obviously, in such a case, the value of mortality tables, even analogically, is reduced to a point where, as a practical matter, their probative worth is destroyed. Furthermore, the question of admissibility of mortality tables was not involved in the Butler case. The real conclusion reached was that under the circumstances mortality tables were entitled to no weight as evidence of the life expectancy of the dying person. That the case was not intended to commit this court to the Michigan rule is apparent upon a consideration of Albrecht v. Potthoff, 192 Minn. 557, 257 N. W. 377, 96 A. L. R. 471, an action to recover for wrongful death. There the evidence indicated that decedent had a weak heart, but it was held that it was not error to admit mortality tables as evidence of her life expectancy, the opinion stating (192 Minn. 557, 565, 257 N. W. 377, 380):

"We cannot say that the mortality tables did not have some probative value." Although the evidence also disclosed that decedent had worked regularly for three years prior to her death, had suffered from no heart illness during that time, and was in apparent good health, she nevertheless was not in the class of persons of the average normal health upon whose lives mortality tables are based.

These tables are not conclusive. They are admissible for the purpose of aiding the jury on the question of the life expectancy of the individual whose expectancy is pertinent to the issue of damages. At best this question is uncertain and necessarily the subject of some conjecture. It is desirable that the jury have the advantage of every circumstance which can reasonably be said to throw some light on the problem. Age, occupation, habits, and general health are to be considered, and it is evident that the analogical use of mortality tables in connection with these other matters will usually be of some help. As pointed out by the trial judge, the effect of mortality tables upon the verdict is large or small as the other evidence shows that analogy to be strong or weak.

In the instant case there is no medical evidence whatever as to the state of Mr. Paine's health or the seriousness of the heart condition. It may have been but a minor contributing factor to his illness. People can and do overcome such obstacles and live out their normal span of life, particularly when the heart ailment is minor in character. In this respect the fact that deceased had improved to the extent that he was beginning to resume his normal occupation and activities was entitled to some weight. The jury heard the evidence which was offered as to the state of his health and had for consideration all the circumstances bearing on his condition and probable expectancy. The weight to be given these matters and the inferences and conclusions to be drawn therefrom were peculiarly within its province. The mortality tables had some probative value as analogical evidence, and it was not error to permit their use for that purpose.

■ There was no error in the court's charge with reference to the tables. In this connection the jury was told that there was proof that a normal person of Mr. Paine's age had a life expectancy of

474

14.92 years, and were also told that this figure was "only an estimate, not necessarily conclusive upon you even as to normal persons, but it is to be considered by you with the other evidence in the case in the light of the evidence as to Mr. Paine's state of health and physical condition before his death and in the light of your general knowledge and good judgment of what the reasonable expectancy of life of Mr. Paine would have been but for his death on this occasion." The court made it plain that the tables were based on the lives of persons in normal health; and, viewing the charge as a whole, it appears that its responsibilities in framing the instructions as to the purpose, weight, and use to be made of the mortality tables were adequately met. See 87 A. L. R. 910.

Two of the remaining assignments relate to alleged errors in the charge in other particulars. The trial judge was of the opinion that an owner who renews a lease of property upon which a dangerous condition has arisen and exists at the time of the renewal is liable to third persons injured by such condition upon the same theory that a lessor is held liable to such persons injured by a dangerous condition existing on the premises at the time of an original leasing. (See Isham v. Broderick, 89 Minn. 397, 95 N. W. 224.) The jury was instructed accordingly, there being evidence from which it could be found that the missing rail was gone at the time the Skauge Drug Company's lease was renewed. In view of the position we have taken with reference to the defendant's liability as lessor under the lease here involved, the question of whether it may also be held liable upon some other theory becomes, under the circumstances, of little importance. However, it may be noted that the authorities are practically in unanimous accord with the view adopted by the trial court, 49 A. L. R. 1418; 16 R. C. L. p. 1079, § 596.

We have subjected the charge to close scrutiny and do not find prejudicial error in the particulars urged. The plaintiff was entitled to the presumption of due care on the part of deceased, and we are unable to see how the court's instruction with reference to the issue of contributory negligence placed any undue burden upon the defense. In a few isolated instances the court did inadvertently

use words which could have perhaps been better chosen, but when read in the light of the entire charge it is evident that no prejudice resulted therefrom.

■ The defendant's contention that the verdict is excessive is without merit. The fact that it is the maximum amount which may be recovered in an action of this nature is not, in itself, important. If the pecuniary loss to those entitled to the benefit of the action could be fairly found to be $10,000, the verdict must stand. According to the mortality tables, the life expectancy of a person in normal health and of Mr. Paine's age is nearly 15 years. The evidence discloses that his family, and particularly the plaintiff, would have undoubtedly derived a pecuniary advantage far in excess of the amount of the verdict if he had lived 15 years. Thus, in considering his expectancy, the jury could have made a substantial allowance for the condition of Mr. Paine's health and still reached the verdict it did. Furthermore, loss of his wages earned for the support of his family is not the only matter to be considered in determining their pecuniary loss by reason of his death. See 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 2617. The five children of the plaintiff and deceased are mature, so the principal pecuniary loss occasioned by his death was that suffered by the plaintiff, but we cannot say that the amount of the verdict, having the approval of the trial judge, is excessive.

A few points raised by the defendant have received consideration but are passed without comment, as they are not of sufficient merit to warrant discussion and the further extension of this opinion. We have found no reversible error.

Affirmed.