## MISSOURI–KANSAS–TEXAS R. CO. OF TEXAS v. WEBB.

### No. 2905.

Court of Civil Appeals of Texas. Waco.

April 13, 1950.

Rehearing Denied April 27, 1950.

O. O. Touchstone, Dallas, G. H. Penland, Dallas, Freels & Elliott, Sherman, for appellant.

King, Jacobs & Davis, Houston, Harry E. Kain, Denison, for appellee.

HALE, Justice.

Appellee brought this suit against appellant under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for the recovery of damages on account of personal injuries sustained by him when a passenger train on which he was the locomotive engineer collided with the rear end of a freight train. The case was tried before a jury. Upon the conclusion of the evidence appellant presented its motion for a peremptory instruction which was overruled. The case was then submitted to the jury on 94 special issues. In response to such issues the jury found that certain specific acts of appellant's employees each constituted negligence and a proximate cause of the injuries sustained by appellee; that certain specific acts of appellee each constituted negligence on his part and a proximate cause but not the sole proximate cause of his injuries; that $63,653.53 was the amount of money which, if paid then in cash, would reasonably compensate appellee for his injuries and for hospital and doctor bills incurred by him as a result thereof; and that $26,640.00 was the amount by which appellee's compensatory damages should be diminished on account of his negligence, taking into consideration the extent to which his negligence contributed to the total amount of found damages. Thereupon, the court entered judgment awarding a recovery to appellee against appellant in the sum of $37,013.53. In due time appellant filed and presented its motion for a new trial which was overruled and perfected its appeal with the result that the cause is now properly pending in this court for review.

By its first point appellant says the court below erred in refusing to grant its motion for an instructed verdict. It contends, as we understand its brief, that the imputable negligence, if any, of its employees in relation to the collision was and is immaterial and insufficient as a matter of law to authorize any recovery on behalf of appellee because the undisputed evidence shows that such negligent conduct, if any, grew out of the breach of duties on the part of its employees which were secondary and incidental to the primary, direct and personal duties which appellee as engineer owed for the safety of himself and others in the movement of his locomotive and since the undisputed evidence further shows that appellee's injuries were proximately caused by his own negligence in breaching the primary duties which he owed to heed warning signals of danger in the movement of his locomotive, he is not entitled to any recovery herein, notwithstanding the provisions of the Federal Employers' Liability Act under which the asserted cause of action arose.

Appellee was engineer on appellant's fast passenger train No. 7, known as the "Bluebonnet", running south from Denison towards Dallas when, on November 10, 1947, at about 7:30 o'clock A.M. his train struck the rear end of appellant's freight train No. 271 a short distance north of the town of Leonard. Appellant's main line is a single track extending south from Denison through the towns of Penlan, Bells, Whitewright, Trenton and Leonard to Greenville and thence to Dallas. Train No. 271 was a regularly scheduled third-class freight train due to depart from Denison at 3:00 o'clock A.M. but on the morning of the collision it actually departed from Denison at 5:40 A.M. and No. 7, scheduled to depart from Denison at 6:20 A.M., actually departed at 6:44. Appellant's train dispatcher issued what are known as wait orders whereby No. 7 was required to wait at Bells until 6:58 and at Whitewright until 7:06, which was later changed to 7:11, but there was evidence to the effect that

the dispatcher did not advise appellee that No. 271 was running immediately ahead of No. 7. Having passed through Bells at 6:43, it was the intention of the conductor on No. 271 to enter the passing track at Whitewright for the purpose of letting No. 7 go ahead. With that object in view the rear brakeman on No. 271 testified that in order to protect his train and to give warning to No. 7 he lighted and dropped a ten minute red fusee on the main line track at a point about 2½ miles south of Bells and again about 1.3 miles north of Whitewright and he placed two torpedoes on the west main line rail, two rail lengths apart, at a point north of the passing track in Whitewright.

When train No. 271 arrived at Whitewright about 7:02 its crew found that an unscheduled, extra, third-class freight train, No. 884, running north from Dallas to Denison, was in the passing track and thereupon the conductor of No. 271 decided to proceed on to Leonard, a distance of 14 miles from Whitewright, and there enter a passing track for the purpose of permitting No. 7 to go ahead. The rear brakeman testified that after he had placed the two torpedoes upon the main line rail north of the passing track in Whitewright he ran back to the depot and when No. 7 showed up in the distance he straddled the main line rail on the engineer's side, lighted a red fusee and began swinging the red fusee and his red lantern in a horizontal arch; that it was his intention thereby to stop No. 7 and board the same for the purpose of advising appellee as to the location and intended movements of No. 271; that appellee answered his stop signal with two short blasts of the whistle and began to slow down but did not stop; that he attempted to board No. 7 as it passed in order to advise appellee of the location and intended movements of No. 271 and, although unsuccessful in his first attempt to board the train, he succeeded in a second attempt; that he immediately found the brakeman on No. 7 and informed him of the location and movements of No. 271 and was advised by the brakeman to see the conductor; that in his efforts to locate the conductor he found the porter on No. 7,

advising him of the situation and finally he contacted the conductor and "I told him the way he was running and with the train he's got, he is going to hit us as sure as the world before we get there"; and that the conductor told the porter to stop No. 7 at Leonard and let the witness off of No. 7.

Appellee testified that he heard the torpedoes explode as he was approaching Whitewright and that he saw the brakeman from No. 271 signaling him to stop but that the brakeman then gave a come on easy signal with his fusee, threw the fusee down and then gave a "saw" signal by rubbing the palms of his hands together and that he did not observe any other warning signal of any kind until he was too close to No. 271 to stop his train without a collision. There was evidence to the effect that No. 271 was 43 cars in length; that there was a passing track at Penlan capable of holding 80 cars, one at Bells capable of holding 53 cars and one at Trenton capable of holding 38 cars, none of these tracks being in use on the morning of the collision, and that No. 271 could have made a "saw" in the passing track at Trenton and thereby permit No. 7 to go ahead. There was also evidence to the effect that conditions of visibility were poor by reason of a heavy fog at and prior to the time of the collision.

In passing upon appellant's asserted right to an instructed verdict, this court must view the evidence as a whole and all reasonable inferences and deductions that may properly be drawn therefrom in the light most favorable to the contentions of appellee. Upon due consideration of all the voluminous evidence before us, we cannot say as a matter of law that appellee's injuries were not proximately caused by any negligence on the part of any of its employees or that the negligence of appellee was the sole proximate cause of his injuries. On the contrary, it appears to us that the evidence in its entirety was sufficient to authorize the jury to find, as it did, (1) that the act of appellant's employees in running No. 271 less than ten minutes ahead of No. 7 from Whitewright to Leonard, and (2) that the failure (a) of appellant's train dispatcher

to advise appellee that No. 271. was running ahead of him, (b) of appellant's conductor on No. 271 to order his train into a siding or passing track between Denison and Leonard, (c) of the crew on No. 271 to throw off any lighted fusees between Trenton and the point of the collision, and (d) of the conductor, brakeman and porter on No. 7 to stop their train before the collision, constituted negligence and that such negligence was in each particular a proximate cause of the collision and its resulting injuries and damages.

The Federal Employers' Liability Act, 45 U.S.C.A. §§ 51-60, as originally enacted by the Congress on April 22, 1908, provides in Section 51 thereof that every common carrier by railroad while engaging in interstate commerce shall be liable in damages to any person suffering injury while employed in such commerce for such injury resulting in whole or in part from the negligence of any of the employees of such carrier. The Act in Sec. 53 thereof expressly abolished the common-law defense of contributory negligence as a complete bar to the right of an injured employee to recover damages·on account of injuries proximately caused by the negligence of his employer but provided that in the event the employee was guilty of contributory negligence his compensatory damages should be diminished by. the jury in proportion to the amount of negligence attributable to such employee. The Act also provided in Sec. 54 that the injured employee should not be held to have assumed the risks of his employment in any action where the violation by such common carrier of any statute enacted for the safety of the employees contributed to the injury of such employee.

In support of its contention of nonliability in this case under the Federal Employers' Liability Act and the primary duty rule as announced and applied by the Supreme Court of the United States with respect thereto, appellant cites, among others, the following cases: Davis v. Kennedy, 266 U.S. 147, 45 S.Ct. 33, 69 L.Ed. 212; Frese v. Chicago, B. & Q. R. Co., 263 U.S. 1, 44 S.Ct. 1, 68 L.Ed. 131; Unadilla Valley Ry. Co. v. Caldine, 278 U.S. 139, 49 S. Ct. 91, 73 L.Ed. 224; St. Louis South-

western Ry. Co. v. Simpson, 286 U.S. 346, 52 S.Ct. 520, 76 L.Ed. 1152; Hunter v. Texas Electric Ry. Co., 330 U.S. 817, 67 S. Ct. 1081, 91 L.Ed. 1269. All of these cases and the others cited in appellant's .brief in support of its asserted right to an instructed verdict, with the exception of the Hunter case, were decided under the Act as it existed prior to the amendment thereof in 1939. By the amendment of Sec. 54 of the Act, as adopted by the Congress on August 11, 1939, it was provided that in any action brought thereunder the injured employee "shall not be held to have assumed the risks of his employment in any case where · such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." Since that time the Supreme Court has expressly held that the legal effect of the amendment was to abolish in toto the doctrine of assumed risk and the primary duty rule stemming from that doctrine as theretofore applied in the cases of Davis v. Kennedy and Unadilla Valley R. Co. v. Caldine, supra. See: Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A. L.R. 967. See also: Keith v. Wheeling & L. E. Ry. Co., 6 Cir., 160 F.2d 654, certiorari denied 332 U.S. 763, 68 S.Ct. 67, 92 L.Ed. 348.

This court, in construing the Federal Employers' Liability Act and applying its provisions to the evidence in the case before us, is required to follow the latest decisions of the Supreme Court of the United States as best we can. Therefore, even though the undisputed evidence shows conclusively, as we think it does, that the injuries and damages herein complained of are attributable primarily to a breach of the legal duties which rested upon appellee as engineer in charge of the movements of his locomotive, we must overrule appellant's first point because we cannot say as a matter of law that the negligence of appellee was the sole cause of his injuries. Bailey v. Central Vermont Ry. Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Eckenrode v. Pennsylvania R. Co.,

335 U.S. 329, 69 S.Ct. 91; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L. Ed. 916; Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Wilkerson v. McCarthy, 336 U.S. 53, 69 S. Ct. 413; Brown v. Western Ry. of Alabama, 77 Ga.App. 780, 49 S.E.2d 833, Id., 338 U.S. 294, 70 S.Ct. 105.

By its second and third points appellant says the trial court erred in refusing to permit it to offer evidence that appellee as a locomotive engineer in a hazardous occupation had a lower life expectancy than an ordinary man and in refusing to permit its witness, Gibson, to testify that the occupation of locomotive engineer is classed as hazardous by insurance companies using mortality tables, that they have a lower life expectancy than the ordinary man, and that they are accordingly rated up by the insurance companies.

Appellee testified at the trial on June 6, 1949, that he was 71 years of age. His witness, Beckham, testified in substance that he was a licensed insurance agent in Texas and represented the Jefferson Standard Life Insurance Company under the supervision of that company's district manager, Gibson; that he was familiar with what is known as the Commissioners Standard Mortality Table of 1941 which was used by his company and other insurance companies; that the life expectancy of a man 71 years of age was 8.52 years; that the discount allowed by his company for commuted values under its policies was at the rate of 2½ per cent per annum; and that the present cash value of $400.00 per month payable monthly over a period of 8 years, when discounted at the rate of 2½ per cent per annum, was the sum of $34,416.00. On cross-examination he testified that the mortality table upon which his calculations were based was a cross-section which represented the average man. He was then asked the following questions: "Do not the life insurance companies consider that a person engaged in the occupation of railroad engineering has a shorter life expectancy than a person engaged in an occupation such as you and I? * * *" "Isn't it a fact, Mr. Beckham, that the insurance companies issuing

insurance to a person engaged as a railroad engineer charge a higher rate therefor because of his shorter life expectancy than the ordinary man?" Counsel for appellee objected to each of the foregoing questions upon the ground that appellee was no longer engaged as a locomotive engineer, the court sustained such objections and appellant excepted.

Appellant later tendered Gibson, District Manager for the Jefferson Standard Life Insurance Company, as a witness and offered to prove by his testimony that his company, in calculating the rate to be charged a locomotive engineer for life insurance, makes a rate-up of $2.50 per thousand per year above the standard rate, but objections on behalf of appellee were sustained and the witness was not permitted to give such testimony. The record discloses that if the witness had been permitted to do so he would have testified before the jury in part as follows:

"Q. I will ask you, Mr. Gibson, whether or not your company in calculating the rate to be charged a locomotive engineer for life insurance, makes any mark-up above a standard rate because of the lower life expectancy due to the hazardous occupation of a locomotive engineer? A. They make a rate-up on locomotive engineers.

"Q. What is that rate-up? A. $2.50 per thousand per year.

"Q. $2.50 per thousand per year? A. Right.

"Q. And what is the meaning of that rate-up? What is the purpose of it? A. Well. I don't know. I am not connected with the Underwriting Department or the Medical Department, but there is evidently a history of some hazard or it wouldn't be there.

"Q. In other words, hazard over and above the ordinary occupation? A. Yes, sir. Any occupation where no hazard exists."

We think the general rule applicable to the question here under consideration is well stated in 17 T.J. p. 741, Sec. 320, as follows: "Mortality tables are never taken as fixing the expectancy of

life of the particular person, or as forming a legal basis for a calculation, but are accepted as furnishing some evidence to be considered by the jury, in connection with all the other pertinent evidence, in ascertaining the probable duration of the life in question." As said in 15 Am.Jur. p. 779, Sec. 339: "Anything which has a reasonable bearing upon the life expectancy of the injured person is admissible and should be taken into consideration." Under these general rules we see no valid reason why the information about which Beckham and Gibson were interrogated should have been excluded from the jury. It is apparent that counsel for each party was of the opinion at the time of the trial that a consideration of such information by the jury would in all reasonable probability be helpful to appellant and harmful to appellee on the general issue of damages, and in this respect we agree with both parties. Consequently, in the light of the entire record before us we hold that the trial court prejudicially erred in refusing to admit in evidence the proffered testimony of the witness Gibson as above set forth. San Antonio & A. P. R. Co. v. Bennett, 76 Tex. 151, 13 S.W. 319; Galveston H. & S. A. Ry. Co. v. Johnson, 24 Tex.Civ.App. 180, 58 S.W. 622, (er. ref.); San Antonio & A. P. R. Co. v. Erglehorn, 24 Tex.Civ.App. 324, 62 S.W. 561, (er. ref.); Southern Kansas Ry. Co. of Texas v. Sage, Tex. Civ.App. 80 S.W. 1038; International & G. N. R. Co. v. Brandon, 37 Tex.Civ.App. 371, 84 S.W. 272, (er. ref.); International Shoe Co. v. Hewitt, 123 Fla. 587, 167 So. 7; Townsend v. Briggs, 99 Cal. 481, 34 P. 116; City of Friend v. Ingersoll, 39 Neb. 717, 58 N.W. 281; Paine v. Gamble Stores, 202 Minn. 462, 279 N.W. 257, 116 A.L.R. 407; Stewart's Adm'r v. Louisville & N. R. Co., 136 Ky. 717, 125 S.W. 154; Thompson v. Camp, 6 Cir., 163 F.2d 396.

Under the Fourth Point in its brief, appellant contends in effect that the trial court erred in overruling its motion for a new trial because the findings of the jury on the damage issues and the resulting award of the court to appellee based thereon are without proper support in the evidence and are so grossly excessive as to require

that they be set aside. We sustain this contention.

The findings of the jury with respect to appellee's compensatory damages were made in response to three special issues, whereby the jury found (1) that $62,160.00 was the amount of money which, if paid then in cash, would reasonably compensate appellee for the damages he had sustained and would sustain in the future on account of pain, suffering and diminished capacity to earn money, (2) that $1,493.53 would compensate him for hospital and doctor bills incurred to the date of trial and (3) that he would not incur any doctor bills in the future.

Appellee and his family physician testified at length concerning the nature, extent and duration of the claimed injuries and disability. According to their testimony appellee sustained first and second degree burns on his face, head and wrists, a compound fracture of the fibula, a fracture of both bones of the ankle at a point one inch above the joint and a dislocation of the ankle joint. Appellee's injured limb was placed in a cast and he was required to remain in a hospital 82 days. He was then fitted with a steel brace through his shoe, extending up and fastened to his leg. He was wearing this brace at the time of the trial. His injuries were permanent in nature and were such as to cause great pain.

Appellee testified that he was 69 years of age at the time of the collision and had been in the employ of appellant for 40 years as a fireman and engineer; at the time of the collision he was earning around $519.00 or $520.00 per month without any overtime; it was his intention, but for his injuries, to continue in the employ of appellant; after receiving his injuries he had been unable to perform any kind of work; and due to general pay increases subsequent to the collision, he would have been earning an average of $600.00 per month at the time of the trial if he had continued in the service of appellant as a passenger engineer.

Notwithstanding the painful and permanent nature of appellee's injuries,

we are forced to the conclusion that the evidence as a whole, when viewed in the most favorable light from the standpoint of appellee, was and is wholly insufficient to sustain a finding of $62,160.00 as reasonable compensation for the damages resulting from such injuries, exclusive of hospital and doctor bills, and that such finding is so excessive that it should not be permitted to stand. No useful purpose would be served by the citation of specific cases heretofore decided in this and other jurisdictions relating to excessive judgments. The issue as to whether the verdict and judgment in any case is excessive must be determined by the evidence in the particular case under consideration.

The finding of the jury which diminished appellee's compensatory damages by $26,640.00 on account of his negligence does not in any sense relieve appellant from the injurious consequences of the excessive judgment as rendered. It rather appears to us that such finding only tends to accentuate the shocking injustice that would result from permitting the judgment to stand.

The jury found that appellee was negligent in failing to bring train No. 7 to a complete stop at the station in Whitewright when he observed the brakeman from No. 271 flagging him with a burning red fusee and that such negligence was a proximate cause of his injuries. We fail to see how reasonable minds could reach any other conclusion from the undisputed evidence because appellee knew, from his intimate acquaintance with the rules of appellant and from his long experience in its service as an engineer, that the color "red" upon the main line track ahead of him was a danger signal which meant Stop. The primary, immediate and inescapable duty to stop train No. 7 at that time rested upon appellee. If he had discharged that duty the collision would not have occurred. The jury further found from a preponderance of the evidence that appellee was negligent (a) in failing to permit the brakeman from No. 271 to board his engine in order that he might ascertain the cause of the two torpedoes and the red fusee,

(b) in failing to comply with appellant's transportation rule No. 10 with respect to visible color signals, (c) in failing to comply with transportation rule No. 108 providing that "in case of doubt or uncertainty, the safe course must be taken", (d) in failing to comply with transportation rule No. 566 providing that "when trains are flagged by flagmen, enginemen must ascertain positively, before proceeding, for what purpose they are flagged, so there can be no possibility of a misunderstanding", and (e) in proceeding through Whitewright without ascertaining from the flagman of No. 271, in person, the cause for which he was being flagged and that appellee's negligence in each of these separate particulars was a proximate cause of his injuries.

Under the law applicable to the evidence in the case it was the prerogative of the jury in the first instance to find the amount of appellee's compensatory damages and to compare the concurrent negligence of the parties as the basis for arriving at a just diminution of such damages. We are cognizant of the broad discretionary powers which are necessarily incidental to the performance of those functions. In the exercise of our appellate jurisdiction to review questions of fact we would be extremely reluctant to disturb the complementary findings on the damage issues unless we were thoroughly convinced beyond any reasonable doubt that such findings were without proper support in the evidence. However, in view of the relative nature of the breached duties upon which the comparative negligence of the parties to this suit is based, we have no hesitation whatsoever in saying unequivocally that in our deliberate opinion the amount of recovery adjudged to appellee by the trial court was not only grossly excessive but the findings of the jury on the damage issues, when considered together on a percentage basis, were and are so clearly against the overwhelming weight and preponderance of the evidence in its entirety as manifestly to be wrong. Accordingly, the Constitution and laws of Texas impose upon this court a solemn obligation to set aside such findings on account of the

insufficiency of the evidence to sustain the same. Constitution of Texas, Art. 5, Sec. 6, Vernon's Ann.St.; Art. 1820 of Vernon's Tex.Civ.Stats.; Choate v. San Antonio & A. P. Ry. Co:, 91 Tex. 406, 44 S.W. 69; Insurance Co. of North America v. Cangelosi, Tex.Civ.App., 217 S.W. 2d 888, pts. 1–3 and authorities.

We do not deem it necessary to discuss or pass upon any of the remaining points of error in appellant's brief as they relate to matters that will not likely be involved in any further proceeding herein. Because of the errors which we have discussed, the judgment appealed from is reversed and the cause is remanded to the court below for another trial. Reversed and remanded.