MYRON J. BLOOMQUIST AND ANOTHER v. WILLIAM H. ZIEGLER COMPANY, INC., AND OTHERS.

133 N. W. (2d) 484.

February 5, 1965—No. 39,174.

*Robins, Davis & Lyons, Harding A. Orren, Lawrence Zelle, Jesse & Cosgrove,* and *Faricy, Moore & Costello,* for appellants.

*Dorsey, Owen, Marquart, Windhorst & West, Horace Hitch,* and *John D. Levine,* for respondent William H. Ziegler Co. Inc.

*Sullivan, McMillan, Hanft & Hastings* and *William P. O'Brien,* for respondent The Zeco Company.

*Murnane, Murnane, Battis & deLambert* and *E. W. Murnane,* for respondent Aeroquip Company.

SHERAN, JUSTICE.

The appeal is from a judgment of the district court dismissing plaintiffs' action with prejudice.

Property damage and personal injuries resulted from a fire which occurred on January 21, 1960, at the plant of Hartzell Manufacturing Company (hereinafter called Hartzell) in St. Paul. Plaintiffs instituted an action against defendants to recover the damages sustained on the fact theory that the fire resulted because a hose and metal fittings used to connect it to a machine in the plant separated and allowed inflammable hydraulic fluid to escape and ignite. The claims of the plaintiffs against defendants sound in negligence and breach of implied warranty.

It is undisputed that on or about November 5, 1959, Hobart Allison, purchasing agent for Hartzell, ordered four hoses of the kind here involved from the Ringerud Equipment Company. Ringerud, in turn, obtained the ordered hoses with attachments from the Zeco Company (a corporation wholly owned by William H. Ziegler Company, Inc.), which in assembling hoses and attachments uses components supplied by the Aeroquip Company. The order as placed by Hartzell and, in turn, filled by Ringerud and Zeco was for four hose assemblies identified by the figures 1332-5-24 given significance by a catalog issued by Aeroquip, the number 1332 being used to describe a certain type of medium pressure hose with connections; the number 5 indicating the inside diameter of the hose to be one-quarter inch; and the number 24 indicating the hose to be 24 inches in length. In response to this order, delivery of four hoses and the connections was made to the Hartzell plant on or about November 5, 1959.

At the time of the fire it was discovered that one of the hoses had become separated from the metal socket to which it was attached upon delivery to Hartzell and, accepting the fact that it was this separation that permitted the escape of the inflammable hydraulic fluid which ignited and precipitated the fire, the crucial question in the case was whether this failure was due to actionable fault on the part of any of the defendants or a variance between the articles as supplied and as

they would have been if manufactured and assembled as required by warranties express or implied.

Plaintiffs had the burden of proving that the fire resulted from a failure of the equipment supplied by defendants and that such failure was attributable to negligence or breach of warranty on the part of one or more of them.[1] At the close of plaintiffs' case, the trial court, being of the opinion that this burden had not been sustained, granted the motion of the defendants then in the case for a dismissal of plaintiffs' action with prejudice. Later it denied plaintiffs' motion for a new trial made before the judgment from which this appeal was taken was entered.

The essential question raised by the appeal is whether the evidence considered in the light most favorable to the plaintiffs would sustain a verdict against the defendants or any of them.[2] In our opinion, the decision of the trial court must be affirmed because there was no evidence

---

[1] The standards used in testing the sufficiency of the evidence in cases such as this are found in the following cases cited by the parties: Swenson v. Erlandson, 86 Minn. 263, 90 N. W. 534; Meyers v. Minneapolis, St. P. & S. S. M. Ry. Co. 168 Minn. 122, 209 N. W. 892; Krell v. Robinson, 173 Minn. 483, 217 N. W. 596; Sherman v. Minnesota Mutual Life Ins. Co. 191 Minn. 607, 255 N. W. 113; Bauer v. Miller Motor Co. 197 Minn. 352, 267 N. W. 206; Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878; Lewerenz v. E. W. Wylie Co. 236 Minn. 94, 51 N. W. (2d) 834; Anderson v. Northern States Power Co. 236 Minn. 196, 52 N. W. (2d) 434; Village of Plummer v. Anchor Cas. Co. 240 Minn. 355, 61 N. W. (2d) 225; Wilson v. Home Gas Co. 267 Minn. 162, 125 N. W. (2d) 725.

[2] See, Mitton v. Cargill Elev. Co. 124 Minn. 65, 144 N. W. 434; McElroy v. Board of Education, 184 Minn. 357, 238 N. W. 681; Sherman v. Minnesota Mutual Life Ins. Co. *supra;* Paine v. Gamble Stores, Inc. 202 Minn. 462, 279 N. W. 257, 116 A. L. R. 407; Kundiger v. Prudential Ins. Co. 219 Minn. 25, 17 N. W. (2d) 49; Hiber v. City of St. Paul, *supra*; Burke v. B. F. Nelson Mfg. Co. 219 Minn. 381, 18 N. W. (2d) 121; Anderson v. Sears, Roebuck & Co. 223 Minn. 1, 26 N. W. (2d) 355; Hanson v. Homeland Ins. Co. 232 Minn. 403, 45 N. W. (2d) 637; Westling v. Holm, 239 Minn. 191, 58 N. W. (2d) 252; Lovejoy v. Minneapolis-Moline Power Imp. Co. 248 Minn. 319, 79 N. W. (2d) 688; Erickson v. Strickler, 252 Minn. 351, 90 N. W. (2d) 232.

presented which could support reasonably a finding that the hose separated from the attachment because of negligence on the part of any of the defendants or because of an absence of warranted properties.

Plaintiffs do not contend that the mere happening of the accident could support a finding of negligence or breach of warranty on the part of the suppliers. The 24-inch hoses with fittings attached supplied by defendants were but a part of the complete operating mechanism which consisted of a machine used to originate and control the pressure conveyed by the medium of hydraulic fluid through a system of hoses to the die-casting machine in which was located an ejector bolt actuated by the hydraulic pressure when applied. Hartzell, through its employees, was responsible for the placement of this equipment and the manner in which the hose and fittings supplied by the defendants were made a part of it. The hose and attached fittings supplied by the defendants left their hands on November 5, 1959, and had been in the exclusive possession of Hartzell between that date and January 21, 1960, when the fire occurred. The nature of the manufacturing process in which Hartzell was engaged was such as to expose the hose and fittings, attached as they were to the die-casting equipment by Hartzell, to movements and possible contacts beyond the control of the defendants, which could readily account for the separation of the hose from its metal fittings without fault or warranty breach attributable to the defendants or any of them.

Plaintiffs do contend, however, that they were entitled to take their case to the jury on the basis of evidence that an examination of the hose and fittings after the fire disclosed defects of such a nature as to permit a finding by the jury that the defects existed at the time of the fire and at the time that the hose and connections were delivered to Hartzell on November 5. The evidence on this phase of the case consisted principally of the testimony of Harold Cartier who, acting in behalf of the plaintiffs, made an analysis of the fitting supplied by the defendants to which the hose was attached at the time of delivery to Hartzell. An understanding of his findings as a result of this analysis makes necessary this description of the connecting mechanism:

The fitting, called a J.I.C. swivel fitting, consists before assembly

of three parts identified as a nut, nipple, and a socket, to be put together in the manner illustrated below:

**NIPPLE**

**NUT**    **SOCKET**

## FIG. 1

The first step in the assembly involves insertion of the hose in the socket. This is done by screwing the hose into it with a counterclockwise turn. Instructions contained in a catalog issued by Aeroquip direct that the hose should be screwed in until it bottoms and then backed off one-quarter turn. The next step in the process is to insert the nipple in the nut so that the shaft of the nipple emerging from the body of the nut is available for connection with the socket and the hose now encased in it. The third stage is to connect the nut and the nipple to the socket with hose encased. This is done by threading the nipple into the socket and hose. In the process, the taper of the nipple moves inside of the hose and as the nipple moves forward into the socket the hose is compressed between the outside of the nipple and the inside of the socket. According to the catalog instructions, the final clearance between the nut and the socket should be from 1/32 to 1/16 of an inch.

234

When the assembly is completed, the hose is held inside the socket by the nipple and the nipple also functions as an axis on which the nut moves freely. The threads on the inside of the nut serve to connect it with the balance of the mechanism.

The analysis of this assembly made by Mr. Cartier, according to his testimony, disclosed that the thread on the inside of the socket and most proximate to the nut was "burred." This burring, he theorized, resulted when the nut with nipple attachment was being joined with the socket and hose during the process of assembly and the two units were brought together to a point where there was no clearance between the nut and the socket, causing the shoulder of the nipple to burr the inside of the socket. He testified that when this occurred there was some fraying or weakening of the hose.

His tests also disclosed that the fitting that failed had a clearance of 104/1000 of an inch between the nut and the socket when examined by him, being 83/2000 of an inch greater than the maximum of 1/16 of an inch specified by the instruction manual. According to Mr. Cartier, this caused the main compression of the wall of the hose to be between the first complete thread on the inside of the socket and the tapered end of the nipple. He reasoned that this process weakened the assembly because the pressure developed on the tapered end, tending to force the hose out of the socket.

Defendants do not concede that the abnormalities noted by Mr. Cartier existed either at the time of the delivery of the assembly to Hartzell or at the time of the fire. We must agree that a finding in favor of the plaintiffs on these essential facts would involve highly speculative elements. The exposure of the hose and fittings to the possibility of damage during the period of almost 3 months during which the device was being used as a part of Hartzell's die-casting procedures; the fact that Hartzell found it necessary to replace a hose and fitting assembly other than the one here involved on the day before the fire; the fact that the elbow forming a part of the die-casting machine to which the hose and fitting assembly was attached appears, in pictures introduced in evidence, to have been twisted from its normal position, showing that there may have been an extraordinary, severe, and un-

explained lateral pull on one of the hoses; the difficulty of concluding that the hose and fitting were not affected by activity incident to fire control; and the possibility that the burred thread and the 104/1000-inch separation between the nut and the socket occurred after delivery of the assembly on November 5, 1959, combine to make the conclusion that the claimed defects were attributable to the defendants extremely difficult, if not impossible, from an evidentiary point of view.

But setting aside these aspects of the case for purposes of analysis, we are satisfied that there is no evidentiary basis from which a factfinder could reasonably conclude that the defects observed in the nut-nipple-socket-hose assembly by Mr. Cartier were of such a nature as to cause the separation of the hose from the socket at the time of the fire. It is true that Mr. Cartier testified that as a result of the hypothesized method of assembly the connection was weaker than it would otherwise have been. But there is no testimony in the case to the effect that this variance between (a) the condition of the assembly as it was hypothesized to have been, and (b) its condition as it would have been had the assembly been a perfect one, caused the hose to separate from the socket. The hose and assembly were designed to withstand internal and lateral pressure far in excess of that applied by plaintiffs during the casting process. Up until the time of this separation, the nut-nipple-socket-hose assembly had apparently been used during the course of some 155 operating hours extending over a period of about 3 months, involving 18,000 applications of hydraulic pressure without any difficulty whatever.

There is nothing in the testimony from which a jury could conclude that the manner in which the hose and connections were allegedly assembled by the defendants did or could cause the joint to fail upon being subjected to a stress representing only a fraction of the rated stress capacity. We know of nothing in the common fund of experience available to jurors which would make it possible for them to arrive at a reasoned judgment on this highly technical question.[3]

---

[3]See, Golden v. Lerch Bros. Inc. 203 Minn. 211, 281 N. W. 249; 7 Wigmore, Evidence (3 ed.) § 2090; 1 Frumer & Friedman, Products Liability, § 12.02; Prosser, Torts (2 ed.) § 44.

It is our conclusion, therefore, that the determination of the trial court that the plaintiffs had failed as a matter of law to sustain the burden of proof was compelled not only for failure to show that the defective condition of the hose connection found by their expert existed at the time the equipment was supplied by the defendants, but also because there was no showing that the observed abnormalities, even if assumed to have existed when the hose separated, were of such a nature as to cause the separation which did occur at that time.

In light of our disposition of the case, claimed error with respect to rulings as to the admissibility of certain evidence becomes immaterial because the critical deficiencies in the proof could not have been remedied even if the offered evidence had been received.

Affirmed.