CHARLOTTE BURKE v. B. F. NELSON MANUFACTURING COMPANY AND ANOTHER.[1]

March 9, 1945.

No. 33,954.

[1]Reported in 18 N. W. (2d) 121.

*Thomas J. Spence,* for relators.

*Horace Van Valkenburg,* for respondent.

MATSON, JUSTICE.

*Certiorari* to review a decision of the industrial commission awarding compensation to the widow of Gerald W. Burke.

October 5, 1943, Burke, a steam fitter's helper employed by the B. F. Nelson Manufacturing Company, was assisting Frank Galgansky, a coemploye, in washing out a steam boiler. The manhole of the boiler opened out on a wooden platform about 3 feet wide and 16 feet long located about 18 feet from the floor. Galgansky and Burke took turns on alternate days working inside the boiler, because the man inside always became soaking wet. On this day, Burke stood directly outside the manhole and assisted Galgansky, who was inside, by first passing to him an electric drop-cord light and a water hose. Then, from a pipe overhead, he suspended, by means of a wire, a 24-inch fan in front of the manhole to keep Galgansky supplied with cool, fresh air.

When Galgansky had finished the interior washing, Burke moved the fan to one side of the manhole, pulled out the light cord, and then removed the hose. As Galgansky was crawling out through the manhole, he heard a grunting sound like "Uh," and as he looked up he saw Burke standing, with his knees flexed, staring straight in front of him with a fixed look. In his left hand Burke was holding the 30- or 35-pound fan by its cage, and in his right hand he held the wire used to suspend the fan, still attached to the fan cage but disconnected from the pipe overhead. Galgansky slid out as fast as he could and rushed to operate the button switch located

in the fan cord about two feet from the fan, but in trying to operate the switch only a buzzing sound resulted. He then gave the fan cord a hard jerk, but Burke still stood clutching the fan. The second jerk, however, severed the cord next to the fan at the point of its entry, and as the cord broke there was a flash at the breaking point. Simultaneously, the lights went out, the fan fell to the floor from Burke's hand, and he collapsed and fell on his side away from Galgansky. Later he was found to be dead. Galgansky, in describing what took place, said: "I was kind of excited, and the fellow was in trouble, and the first thing I thought of was to get the juice off the fan so that he could let go." .

The autopsy conducted by Dr. Clauson, University of Minnesota pathologist, in the presence of Dr. Russell R. Heim, Hennepin county coroner, Dr. J. S. McCartney, representing the insurance company, and two other physicians on the coroner's staff, revealed cyanosis grade 2 of the lips and a normal condition of the organs of the body except as hereinafter indicated. The heart revealed grade 2 intimal sclerosis of the root of the aorta and grade 1 intimal sclerosis of the anterior descending and circumflex branches of the left and right coronary arteries. The lumen was open everywhere, and no sign of thrombus was found. There were no scars on the myocardium. The lungs showed congestion and an excess of frothy fluid. The diagnosis was: (1) Probably electrocution; (2) acute congestion of organs; (3) old primary pulmonary tuberculosis; (4) silicosis.

It was the opinion of Dr. Heim that the grade 1 and grade 2 scleroses above described, the old primary pulmonary tuberculosis, and the evidence of silicosis could not be assigned as causes of Burke's death. It was his opinion that cyanosis grade 2 may indicate asphyxiation, trouble with breathing, and poor aeration of the lungs. In speaking of the lungs, Dr. Heim said:

"* * * The cut surface of the lung showing congestion and excess of frothy fluid could indicate that there could have been a definite labored respiration or changed respiration due to shock and due to depressing of the respiratory center which would cause

in a short time asphyxiation and could be the definite cause for * * * improper pumping of the heart. * * * the congestion and excess of frothy fluid would indicate that respiration was interfered with."

The autopsy revealed no evidence of electric burns and no electric tracks in the body muscles or tissues. Dr. Heim, in speaking of the effects of electricity, said: "It may not show anything upon the human anatomy grossly or microscopically and still cause death." He further testified that an electric current shocks the respiratory center, resulting in cessation of respiration with consequent asphyxiation, at which time the heart stops beating. Assuming the truth of the observations made by Galgansky, *but not his conclusions,* coupled with the findings of the autopsy, it was the opinion of Dr. Heim that the cause of death was *probably* electrocution, but that electrocution could not be assigned as the definite and certain cause of death in the absence of direct proof that Burke did receive an electric shock.

Dr. R. F. McGandy testified for relators that it was his opinion, *based on reasonable medical certainty,* that Burke's death could not be ascribed to electrocution in the absence of proof that he had been in contact with electricity through bipolar contact or through unipolar contact coupled with a grounding of the decedent's body. It was his opinion that there could be no grounding of Burke's body while standing on a wooden platform or while in contact with a wooden railing unless the platform or railing were sopping wet and in contact with something like a pipe.

The employer's regular plant electrician, Mr. Paul Tibou, who was out for lunch when the accident happened, about one-half hour after his return tested the fan for short circuits. The test was conducted with the fan standing on a desk or bench and not in a suspended position. He found absolutely no trace of any short circuit, but admitted that it was impossible to determine whether or not the insulation had been defective at the point where the fan cord had been severed next to the fan. He estimated that the cord was of a tensile strength sufficient to support the weight of an

average man. He testified that the fan housing was waterproof. Upon cross-examination, he pointed out that water in a sufficient quantity could cause a short circuit where and if a defect in the insulation of both wires existed; and, likewise, that sufficient water in the right place could ground a terminal to the motor frame. In the case of a short circuit, he said that water would soon evaporate from the heat generated by the electric current.

Mr. Hermstad, an outside electrician, was called to the plant the next day to give the fan another test for short circuits. He likewise found no indications of any short circuit. He said he made no particular test of the switch or of the wire. The fan cord, in his opinion, had a tensile strength of about 150 pounds on a straight pull without a jerking or shearing effect. He could not determine whether or not there had been a short circuit in the cord, because the evidence was destroyed.

■ It is our duty to review the evidence in the light most favorable to the findings of the industrial commission in determining whether or not the facts and the reasonable inferences to be drawn from them sustain the findings that the decedent's death arose out of and in the course of his employment. Kiley v. Sward-Kemp Drug Co. 214 Minn. 548, 9 N. W. (2d) 237; 6 Dunnell, Dig. & Supp. § 10426.

■ There is no conclusive evidence that Burke was electrocuted. Relators contend that the finding of electrocution is based on mere conjecture and speculation and cannot be upheld, and they allege that the presence of grade 2 intimal sclerosis and grade 1 arterial sclerosis establish more definitely the cause of death. The burden of proof rests upon the claimant, and clearly a recovery cannot be based on mere speculation and conjecture. Adler v. Interstate Power Co. 180 Minn. 192, 230 N. W. 486. Nevertheless, if the proof furnishes a reasonable basis for an inference that an employe died from an electric shock sustained during and in the course of his employment, that is sufficient. Kvernstoen v. Nelson, 212 Minn. 102, 2 N. W. (2d) 560; 6 Dunnell, Dig. & Supp. § 10406. If the evidence as a whole provides a reasonable basis for an inference

that his death arose out of and in the course of his employment, direct proof is unnecessary; provided, however, that such inference is based, not on mere conjecture and speculation, but on known facts consistent with the theory that he so died.

The facts speak for themselves. Burke stood apparently frozen to the spot with a fixed stare; and, although the fan cord was given a hard jerk, he remained upright and did not collapse until the second jerk severed the electric cord next to the fan. A few moments before he had handled a water hose, and it is not unreasonable to infer that he spilled and splashed some water about him. His lungs disclosed congestion and an excessively frothy condition similar to the effects produced by electric shock. An outstanding pathologist conducted the autopsy and joined in a diagnosis of electrocution as the *probable cause of death*. Although Dr. Heim, the county coroner, could not say that electrocution was the definite and certain cause of death, nevertheless he concurred in the diagnosis that it was the *probable* cause, and he was definitely of the opinion that death had not resulted from sclerosis. Dr. McGandy, on a basis of *reasonable medical certainty*, could not attribute death to electrocution in absence of proof of Burke's actual contact with electricity. It is to be noted that the electrical experts were unable to determine from their tests whether the insulation on the fan cord was defective where the break took place next to the fan. These and other salient facts are consistent not only with the theory of Burke's electrocution, but provide an adequate basis for a reasonable inference that he so died, an inference certainly not founded on mere conjecture and speculation. It is not necessary that the inference of electrocution should meet Dr. McGandy's test of reasonable medical certainty.

The absence of direct proof that Burke came into actual contact with electricity does not destroy the reasonableness of the inference of electrocution. In Smith v. Twin City Rapid Transit Co. 102 Minn. 4, 6, 112 N. W. 1001, 1002, where the decedent was employed to paint a metal pole to which electric trolley wires were attached by glass caps or insulators, the court held:

"The appellant contends that there was no evidence from which a jury could reasonably find that the deceased received a shock of electricity, that there was no evidence tending to prove that the cap became charged with electricity through its negligence, * * *.

"* * * It is true that no one saw the deceased until he was falling from the ladder, and the evidence is not conclusive that he had received a shock of electricity before he fell; but, when we take into consideration the circumstances and conditions, it is certainly reasonable to conclude that such was the fact. The probabilities are strongly in favor of the conclusion to which the jury arrived, and a court would not be justified in interfering with the verdict upon this ground."

Here, the best witness, the employe, is dead, and it would indeed be difficult for the surviving dependent to establish that death arose out of and in the course of his employment if it were not permissible to draw reasonable inferences from the facts known to exist. Essential facts, incapable of establishment by direct evidence, may be proved by reasonable inferences drawn from facts shown to exist. See, Mitton v. Cargill Elev. Co. 124 Minn. 65, 144 N. W. 434; Ferch v. Great Atlantic & Pacific Tea Co. 208 Minn. 9, 292 N. W. 424; Horovitz, Workmen's Compensation (1944) pp. 133-134; Sawyer's Case, 315 Mass. 75, 51 N. E. (2d) 949; F. W. Woolworth Co. v. Industrial Acc. Comm. 17 Cal. (2d) 634, 111 P. (2d) 313.

■ Relators contend that upon the evidence it is more probable that Burke's death resulted from sclerosis. Under our decisions, we have this well-established rule:

"It is for the triers of fact to choose not only between conflicting evidence but also between opposed inferences. * * * It is only where the inference upon which the challenged finding rests is not itself reasonably supported or where it is clear that the whole evidence is in manifest and undeniable preponderance against it (even though there is some support for it in the evidence) that there should be a reversal." Maher v. Duluth Yellow Cab Co. 172 Minn.

439, 442, 215 N. W. 678, 679, and cases cited at p: 442. Also see, Reinhard v. Universal Film Exchange, Inc. 197 Minn. 371, 375, 267 N. W. 223, 225; Hill v. Umbehocker, 201 Minn. 569, 277 N. W. 9.

Where, upon circumstantial evidence in civil cases, there is a reasonable basis for diverse inferences, the choice of an inference made by the fact-finding body is to be sustained, unless (1) the conflicting inferences stand in equilibrium so that reasonable minds cannot prefer one over another, or unless (2) the choice of inference is otherwise based on mere conjecture and speculation, or unless (3) the inference adopted is manifestly and undeniably contrary to the weight of the evidence as a whole. Clearly, it is not necessary that the evidence in support of the inference adopted must outweigh other reasonable inferences so as to demonstrate their impossibility. See, Sherman v. Minnesota Mut. L. Ins. Co. 191 Minn. 607, 255 N. W. 113; 23 Minn. L. Rev. 78; Schoewe v. Winona P. & G. Co. 155 Minn. 4, 191 N. W. 1009; Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 215 N. W. 678; Smith v. Mason Bros. Co. 174 Minn. 94, 218 N. W. 243; Austin v. Leonard, Crossett & Riley, Inc. 177 Minn. 503, 225 N. W. 428; Tomhave v. Galena, 180 Minn. 289, 230 N. W. 652; Reinhard v. Universal Film Exchange, Inc. 197 Minn. 371, 267 N. W. 223; Hill v. Umbehocker, 201 Minn. 569, 277 N. W. 9; Paine v. Gamble Stores, Inc. 202 Minn. 462, 279 N. W. 257, 116 A. L. R. 407; Lunde v. Congoleum-Nairn, Inc. 211 Minn. 487, 1 N. W. (2d) 606; National Pole & Treating Co. v. Gilkey, 182 Minn. 21, 233 N. W. 810.

The evidence in this case preponderantly supports the inference relied upon by the industrial commission in its findings, and therefore the findings must be upheld.

Respondent is allowed $250 attorney's fees and costs in this court. Writ discharged and order affirmed.