CLAUDIA K. MAJERUS, TRUSTEE FOR NEXT OF KIN
OF EMIL WILLIAM MAJERUS, v. TILLIE M. GUELSOW AND/
OR STANDARD ACCIDENT INSURANCE COMPANY.

113 N. W. (2d) 450.

February 2, 1962—No. 38,196.

*Carroll, Thorson, Anderson & Cronan,* for appellants.
*Howard I. Donohue,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment and from an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial.

This is an action for death by wrongful act brought by Claudia K. Majerus, as trustee for the next of kin of her deceased husband, Emil Majerus. Plaintiff claims that the decedent received fatal injuries while descending a basement stairway which she alleges was negligently maintained by the landlord, defendant, Tillie M. Guelsow. As a second count of the complaint, plaintiff also alleges that her deceased husband was an employee of defendant and that at the time of his injuries and death he was in the performance of his duties as such employee of defendant, who failed to provide a safe place for him to work.

The defendant denied any negligence in the maintenance of the stairway, alleged contributory negligence and assumption of risk, and denied the master-and-servant relationship.

The issues were submitted to the jury through a special verdict containing 14 interrogatories. In substance the jury found for plaintiff and awarded $7,500 in damages. Specifically it found that defendant was negligent, that such negligence was the proximate cause of the decedent's death, and that the latter was not contributorily negligent.

On Sunday, January 25, 1959, about 8 a. m., Emil Majerus was

found dead in the basement of an apartment house in Sauk Centre, owned by defendant, Tillie M. Guelsow. He and his wife were tenants of Mrs. Guelsow, and in addition he performed certain duties for Mrs. Guelsow in return for a five-dollar-a-month reduction in rent. These duties consisted of looking after the furnace, sump pump, and water softener — all located in the basement — and shoveling snow from the sidewalks. Decedent was 66 years old, weighed about 220 pounds, was receiving social security, and worked at a local garage as a mechanic. He returned to his apartment for lunch about noon on Saturday, January 24, 1959. He was dressed in overalls, jacket, work shirt, and cap. There is testimony that during the noon meal decedent stated that he had a job to do that afternoon and when it was finished he would return and fix the sump pump in the basement and take his wife to church that evening. He was dressed in his work clothes when he left his apartment about 1 p. m.

Plaintiff testified that when her husband did not return for supper Saturday evening she "took it for granted that he was called out somewhere." She was not sure about whether she had supper herself, but said she looked at the television and after the 10 o'clock news program she went to bed. She said she and her husband occupied the same bedroom, with twin beds, and when she awakened about 7:30 the next morning, she observed that her husband was not in his bed. After dressing she went downstairs and outside, where she saw her husband's car. She next opened the basement door, saw the basement lights on, called, and upon receiving no answer, walked down the steps and observed the body of her husband in the basement. She then came upstairs to get help and met Dr. and Mrs. Henry Banal, also tenants in the building.

Dr. Banal, a veterinarian, testified that plaintiff was quite upset and told him that her husband was downstairs. The doctor then went to the basement and found Mr. Majerus near the stationary tubs, some 30 feet from the bottom of the stairs. He examined the body and determined that Majerus was not alive at that time.

Dr. A. B. Nietfeld, the deputy coroner, testified he was called about 8:30 o'clock Sunday morning, January 25. Upon arriving at the building he went to the basement where he found decedent's body lying

face down at the east end of the basement. His examination of the body disclosed that decedent had bruises over one eye and over the back of his head and other bruises, and had been dead for some time—"[o]ver a couple of hours at least"—as rigor mortis was complete.

Plaintiff testified that when she found her husband lying in the basement he was wearing different clothes from those he had on at lunch.

John Hardigan, chief of police, who went to the building with Dr. Nietfeld about 11 o'clock on Monday morning, January 26, testified that they found two flashlights, a file, and a pencil under the stairway. He said there was one spot of blood 10 feet from the steps leading to the east, one in front of the drier, and one in front of the tubs where decedent was found; also one under the second step of the stairway, where he found the flashlights and pencil. The witness observed that the dust was disturbed under the stairway from the platform to the basement floor, that there were no cobwebs, but that there were cobwebs under the open structure which held up the platform.

He said that he examined the flight of 13 steps, using a flashlight; that the third step from the bottom "had a little splinter on it at that time" which was a fresh break chipped off from a piece of wood. When questioned as to his observations of that step, the witness replied that it was much shorter than the rest of the steps; that the "overhang" was broken off and that it appeared to be an older break. He explained that the second step from the bottom had a gouge in it on the north side, as if something hard had hit it, but he could not say how it was made.

Gene Kropp, a general contractor, testified in behalf of plaintiff that he made measurements of the stairway in the presence of defendant's counsel; later he prepared a sketch which was introduced into evidence. The sketch indicated that the stairway had 13 steps, a landing, and then a "ladder" of five more steps; that the risers of the 13 steps varied in height, the top one being 5 3/8 inches, the one below 7 5/8 inches, and the others varying from 8 to 8 3/8 inches; that the treads varied in width from 7 3/4 inches to 11 5/8 inches; and that most of the steps were not quite level. He said that the third step from

the bottom had 1 1/4 inches of the edge broken off; that the overhang from the fourth step left but 6 3/4 inches of the third step upon which to place one's foot; and in addition that the third step was loose and had a "rubbery" effect when stepped on. There was no rail on either side of the 5 steps between the landing and the basement.

One tenant, Mrs. Banal, testified that, although the basement was used by tenants for their laundry, there had not been any previous accidents on these steps; however, she was allowed to state without objection that she "was really afraid of the stairway."

The manager of the American Legion Club, which was located on the first floor of defendant's building, testified that he observed decedent in the club rooms of the Legion Club between 4 and 5 o'clock on the afternoon of January 24. The witness, who was tending bar in the club at the time, said that he thought that decedent had two drinks of whisky. He claimed that decedent remained at the club for about 45 minutes and that when he last saw him his talk was normal and there was nothing out of the ordinary in his appearance. There was also testimony that decedent was observed drinking some four glasses of beer at the Corner Bar about 3 o'clock that afternoon.

About 2 months after the death, Dr. A. E. Davis, Jr., a pathologist, performed an autopsy. He testified that there were bruises on both knees, on the back of both arms, and on the back and top part of decedent's head, and that there were abrasions over the elbows and areas of hemorrhage over the left eyelid and at the neck area. He also found a skull fracture at the base of the skull and was of the opinion that "Mr. Majerus fell downstairs." In describing the skull fracture, the pathologist testified that decedent was hit on the top of the head. It was his opinion that the death of the decedent was not instantaneous and that it was possible that he was up and able to walk after the accident. This may account for the change of clothes, if that occurred after the accident, and for the distance the body was found from the stairway after the accident.

The defendant assigns as error: (a) That the trial court erred in denying her motion for a directed verdict; (b) that the trial court erred in denying her motion for judgment notwithstanding the verdict;

and (c) that the trial court was bound by the answers of the jury to interrogatories 3, 6, and 7 of the special verdict.

■ Defendant argues that plaintiff wholly failed to prove any actionable negligence on her part which was the proximate cause of the death and that the trial court should have directed a verdict for her or granted her motion for judgment notwithstanding the verdict. She argues that the verdict is premised upon pure speculation and conjecture in the absence of any direct proof as to the activities of the decedent or how he met his death during a so-called 15-hour "black-out" period. She contends that to impose liability upon a landlord under such circumstances in effect makes him an insurer of the safety of all tenants and invitees.

Where one party moves for a directed verdict, he admits for the purposes of the motion the credibility of the evidence for the adverse party and every inference which may be fairly drawn from such evidence, and the most favorable aspect must be ascribed to the evidence of the adverse party. A verdict may be directed only in those unequivocal cases where it clearly appears to the court on the trial that it would be its manifest duty to set aside a contrary verdict as not justified by the evidence or as contrary to the law applicable to the case. If there is a question of fact, it creates a jury issue, and to direct a verdict would constitute reversible error. Kolatz v. Kelly, 244 Minn. 163, 69 N. W. (2d) 649.

On a motion for judgment notwithstanding the verdict the single question is whether there is any competent evidence reasonably tending to sustain the verdict. The motion should be granted only when it appears that the evidence is conclusive against the verdict. Peterson v. Minnesota Power & Light Co. 206 Minn. 268, 288 N. W. 588; Northwestern Marble & Tile Co. v. Williams, 128 Minn. 514, 151 N. W. 419.

We recognize that the questions of the negligence of the defendant and, if found, whether it was the proximate cause of the death of decedent, may be considered close ones under the record here. However, where the verdict of the jury involves disputed fact questions, we are bound to consider the evidence in the light most favorable to the verdict, and the verdict will be sustained if it is possible to do so on any

reasonable theory of the evidence. In reviewing the record, we are obliged to give the verdict the benefit of every reasonable inference which may properly be drawn to its support from the evidence as a whole. Therefore, unless the verdict of the jury is manifestly and palpably contrary to the evidence, it should not be set aside. McCree & Co. v. State, 253 Minn. 295, 305, 91 N. W. (2d) 713, 720.

A review of the record in its entirety satisfies us that there was evidence here from which a jury could reasonably determine that the stairway involved was defective in places and that defendant was negligent in so maintaining it. There was also evidence from which a jury could infer that the death of decedent resulted from a fall down the stairway; for example, the flashlight and tools under the stairs and the fresh splinter on the third step from the bottom, as well as the testimony of Dr. Davis as to fracture at the base of the decedent's skull, and his opinion that decedent fell downstairs.

It is the finding that the fall was *caused by* the negligence of defendant which is most strenuously attacked here. Even if negligence and the fall down the stairs be admitted, plaintiff still had to prove that the negligence was the proximate cause of the fall. However, it is not the law that there must be an *eyewitness* to the accident; it is enough if the evidence is such that the jury can reasonably infer that the defective stair was the cause of the injury and death. As stated in Mitton v. Cargill Elev. Co. 124 Minn. 65, 71, 144 N. W. 434, 436:

"* * * Plaintiff was not required to prove causal connection by direct evidence. If the circumstantial evidence was 'something more than consistent' with plaintiff's theory, if it furnished a reasonable basis for the inference by the jury of the ultimate fact that the alleged negligence was the cause of the injury complained of, it is sufficient proof of the causal connection to sustain a verdict. *Plaintiff was not bound to negative all possible circumstances which would excuse the defendant.* Where a cause is shown that might produce a given accident, and the fact appears that an accident of that particular character did occur, *it may be a warrantable inference, in absence of a showing of other causes,* that the one known was the operative agency in bringing about the result. [Citing many cases.]" (Italics supplied.)

From the facts and circumstances shown here, a jury could reasonably infer that the defect in part of the stairway was the cause of the accident which culminated in decedent's death. It is true that there are other possible inferences, such as, foul play resulting in some-one pushing him down the stairs, his falling while intoxicated, an injury received before he returned to the apartment; but none of these creates as reasonable an inference as that reached by the jury. The jury found here, based upon evidence as to the time in which alcohol is metabolized and upon the testimony of those who last saw the decedent, that intoxication was *not* a cause of the death.

As stated by Mr. Justice Matson in Burke v. B. F. Nelson Mfg. Co. 219 Minn. 381, 388, 18 N. W. (2d) 121, 124, "it is not necessary that the evidence in support of the inference adopted [by the fact-finder] must outweigh other reasonable inferences so as to demon-strate their impossibility."

In Paine v. Gamble Stores, Inc. 202 Minn. 462, 279 N. W. 257, 116 A. L. R. 407, defendant was shown to be negligent in main-taining a stairway with a defective handrail, and decedent was found in an areaway at the foot of the stairway, but there was no direct proof that the condition of the handrail was the proximate cause of his death. As in the present case, decedent was not seen from the early afternoon until his body was discovered the next morning — over 16 hours later. However, the evidence showed that the dust on the bottom steps was undisturbed, that a fresh scratch was on the wall, and that deceased had a weak leg which sometimes required him to grasp something to keep from falling. This court affirmed a verdict for the plaintiff, holding that the evi-dence warranted an inference that the negligence was the proxi-mate cause of death. The court stated (202 Minn. 469, 279 N. W. 260):

"The defendant suggests several 'possibilities,' and perhaps more could be added with but little effort. Nevertheless, having determined that the evidence furnishes a reasonable basis for the jury's finding of proximate cause, the verdict must stand unless there is a manifest and undeniable preponderance to the contrary, * * *."

As in the instant case, there was present the abstract possibility that the death resulted from an attack by some third person or that the fall or death had been the result of a heart attack, especially in light of the fact that the decedent there had been recently treated for a heart condition. The court rejected these suggestions as no more reasonable than the jury's conclusion, saying that (202 Minn. 470, 279 N. W. 261) "it was for the jury to determine its weight and choose between the conflicting inferences."

In Standafer v. First Nat. Bank, 243 Minn. 442, 68 N. W. (2d) 362, decedent was loading freight on top of one elevator and was thereafter found at the bottom of the adjoining elevator shaft. The court distinguished the facts there from Hagsten v. Simberg, 232 Minn. 160, 44 N. W. (2d) 611. The court said that in the latter case, involving the death of a child, there had been (243 Minn. 447, 68 N. W. [2d] 366) "a complete absence of proof of any act or failure to act on the part of defendant from which the jury could draw an inference of negligence." In the Standafer case, however, the court said (243 Minn. 447, 68 N. W. [2d] 366): "Defendants' departure from their customary caution of having an adjoining elevator opposite the freight elevator when the top of it was being used to load freight might well be enough to establish negligence." The court went on to say ( 243 Minn. 448, 68 N. W. [2d] 366):

"While it is true that the proof fails to show exactly how the accident happened, that likewise is true in many negligence cases. It is not necessary that there by eyewitnesses to the happening of an accident before there may be recovery. *If the evidence establishes facts from which a jury reasonably may draw an inference of negligence and that it was a proximate cause of the happening of the accident,* it no longer is a question of law for the court." (Italics supplied.)

In Erickson v. Strickler, 252 Minn. 351, 90 N. W. (2d) 232, the court reversed a directed verdict for the defendant, holding that though there were no eyewitnesses to the origin and progress of a fire, the evidence justified the inference that a fire started by defendant was the proximate cause of plaintiff's damage. We stated there that (252 Minn. 355, 90 N. W. [2d] 236) "[i]f the circumstantial evi-

dence furnishes a reasonable basis for inferences by the jury of the ultimate fact that the alleged acts of the defendant caused the injury complained of, it is sufficient proof of causal connection to sustain a verdict."

It is our opinion here that the question whether the evidence sustains the inference of proximate cause was for the jury. Only when the evidence is clearly insufficient to allow the inference is this court justified in reversing the judgment. Paine v. Gamble Stores, Inc. *supra.* The facts and circumstances in this case allow many possible inferences, but this court must not invade the province of the jury when it has made an inference reasonably warranted by the evidence.

■ Defendant argues that the trial court was bound by the findings of the jury as to interrogatories 3, 6, and 7 of the special verdict. These interrogatories and the jury's answers read as follows:

"3. Was Emil Majerus' employment in the course and scope of Tillie M. Guelsow's business and vocation?

Answer yes or no — Yes"

"6. Did the injury received arise out of and in the course of Emil Majerus' employment by defendant?

Answer yes or no — Yes"

"7. Did Tillie M. Guelsow own the apartment property as an investment or as a business enterprise?

Answer — Investment & Business"

After the special verdict was received, counsel for defendant moved to change the answers to interrogatories 1, 3, and 6 and insert "No" for each of the three "Yes" answers and in addition to strike "and business" from answer 7. The trial court granted this motion except as to interrogatory 1. That interrogatory, finding that decedent was an employee of defendant, it refused to change.

It would seem that the trial judge should have the same powers with regard to special verdicts or special interrogatories as he has with regard to general verdicts. It is fundamental that a court in its discretion may set aside a general verdict under certain circumstances. If that is so, why should it not also have a right to set aside a

special verdict or special interrogatories under similar circumstances? When he determines that the evidence is conclusive against the jury's verdict, he can enter judgment notwithstanding the verdict in the case of a general verdict; and in the case of a special verdict or special interrogatories, he can set aside the answers and substitute contrary answers therefor. See, Rules 49.01, 49.02, and 50.02 of Rules of Civil Procedure.[1] As stated in Sorlie v. Thomas, 235 Minn. 509, 511, 51 N. W. (2d) 592, 594, a jury's verdict on specific fact questions "is as binding on the court as a general verdict in a law action and is subject to the same rules as to setting it aside for insufficiency of evidence." In other words, answers to special interrogatories or special verdicts are not simply advisory; but at the same time they are no more final than a general verdict. If certain answers find no support in the evidence, the trial judge may set them aside; his action will be upheld on appeal unless clearly erroneous. Thomson & Kelly Co. v. United States M. & S. Ins. Co. 263 Mass. 181, 160 N. E. 668, 57 A. L. R. 944.

The question then is whether there is competent evidence tending to support the jury's findings. If there is, then the trial court committed error in setting them aside.

However, we need not decide this question, for we are of the opinion that defendant is estopped from raising it. "The settled general rule is that a party cannot avail himself of invited error." McAlpine v. Fidelity & Cas. Co. 134 Minn. 192, 199, 158 N. W. 967, 970. Here it was the attorney for the defendant who requested the trial judge's action; defendant will not now be heard to attack that action. It is true that defendant's counsel on appeal is in fact counsel for her insurer, whereas the motion below was made by defendant's personal counsel.[2] But defendant's attorneys all act for her as an individual.

---

[1]Rule 49.01 authorizes special verdicts, while Rule 49.02 authorizes general verdicts accompanied by answers to interrogatories. Rule 50.02(1) does not differentiate between these types of verdicts, but provides generally that "[a] party may move that judgment be entered notwithstanding the verdict * * * and the court shall grant the motion if the moving party would have been entitled to a directed verdict at the close of the evidence."

[2]Though defendant's insurer was not a party to the action in the court

Acts of one attorney cannot be attacked in her name by another attorney. Counsel for the insurer was fully apprised of the conflict of interest with defendant in this respect for many months but made no objection until after the trial judge ruled against it. The insurer should be estopped to raise the point now.

In view of this determination, it becomes unnecessary to rule on the motions relating to the intervention of the insurer.

Affirmed.

OTIS, JUSTICE (dissenting).

I dissent. There is no evidence to support a finding that the defects in the stairway proximately caused decedent's fall. The verdict is based on pure speculation and conjecture.

KNUTSON, CHIEF JUSTICE (dissenting).

I concur in the dissent. There just is nothing to establish that the minor defects in this stairway had any causal relation to the fall.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

below, its counsel acted as cocounsel for the defendant. It appears from an affidavit of insurance counsel that defendant's insurance policy excludes coverage for "death of any employee of the insured arising out of and in the course of his employment by the insured." By reason of this clause the insurance company apparently feels that, but for the action of the district judge in changing the answers to the interrogatories, it would not be liable on the policy.