## PAULINE F. JONES v. WHITAKER BUICK COMPANY.

130 N. W. (2d) 334.

July 31, 1964—No. 38,966.

*Robins, Davis & Lyons, S. Robins,* and *Stanley E. Karon,* for appellant.

*Brenner & Harroun* and *Bernard M. Harroun,* for respondent.

FRANK T. GALLAGHER, C.

Appeal from a judgment of the district court in favor of defendant. This action arises out of a fall sustained by plaintiff, Pauline F.

Jones, on November 7, 1958, when leaving the garage of defendant, Whitaker Buick Company, a Minnesota corporation.

Plaintiff, aged 53 at the time of the accident, resided in St. Paul with her invalid husband. In October and November 1958, defendant ran some advertisements in the St. Paul papers for winterizing service at a special rate. Defendant's place of business is located on the north side of University Avenue in St. Paul, the front of which faces south on University.

On November 6, 1958, plaintiff took their Buick car to defendant's business place to have it winterized. Neither she nor her husband had been there before. She testified that she brought it to the front entrance driveway and told someone who met her that she wanted it "serviced following this ad in the paper. They took my car and told me to go in the front entrance and wait where the display room was." She stood there for a while and was then informed that it would take some time to see about her car. She had waited for about 2 hours when Ray Helseth, service adviser at the garage, told her that they had her car apart and it needed quite a bit of attention, to which she replied, "I just brought it in to have it serviced for winterizing." He informed her that they had a lot of work that day and that they would like to keep the car overnight. She then asked about getting home and was told by Helseth that he would take her home.

At the rear of defendant's garage is a large overhead door approximately 12 feet by 15 feet with a number of windows in it. Within that large door is a smaller one with six panes of glass in it, which will be referred to herein as the pedestrian door. The measurement of that door is 4 feet 11⅛ inches high and 2 feet 6 inches wide. The pedestrian door was not flush with the bottom of the large door there being a rise of 6 inches from the floor to the bottom of the little door. Anyone entering or leaving defendant's place of business by means of the pedestrian door had to step up over the rise of 6 inches. The floor of defendant's place of business near the overhead door and the pedestrian door, on both the inside and outside, was of concrete and was on the same approximate level. The large overhead door was painted blue, and the pedestrian door was painted white. Around the pedestrian

door was a small border that was painted white. At the top of the pedestrian door on the inside was placed some heavy felt or insulation similar to that used around air conditioners. There was some testimony that the felt or insulation was placed there so that it would act as a bumper and people would not hurt themselves passing through the door. Immediately below the felt or insulation was a sign reading "STOP! CAUTION" on the first line and "LOW DOOR" on the second line. A large, heavy coil spring was affixed to the pedestrian door extending diagonally across the top and attached to the large door, which would automatically close the small door after it was opened. There was a sign on the back of the building, to the right and higher than the top of the pedestrian door, which read "EXIT ONLY" on the first line and "USE FRONT ENTRANCE" on the second line.

There was testimony that customers of defendant had used the pedestrian door over a period of years; that defendant directed customers to go in and out of the building by means of the pedestrian door; that the pedestrian door was used as a means to go to and from the parking lot north of defendant's place of business; and that the lights in defendant's place of business were turned on at 7 o'clock in the morning and remained on until evening when the janitor completed cleaning the premises.

Plaintiff is 5 feet 4¾ inches tall. On the day of the accident she was wearing shoes with 2¼-inch heels, a heavy winter hat which extended approximately 1 inch above her head, making her 5 feet 8 inches tall from head to foot as she was dressed that day.

When Ray Helseth and plaintiff started out for her home, they left from the front part of the building, where plaintiff had been waiting, and went out through the garage to the small pedestrian door leading to the parking lot behind the garage. In connection with her departure for home, plaintiff testified as follows:

"Q. Did Mr. Helseth then arrange to take you home?

\* \* \* \* \*

"A. He said, 'Let's go out this door. There's a car out in the back lot that I'll use,' and he took me to this small door in the large garage and he says, 'Now be careful, this is a dangerous door. There's felt

on here, so you see if you hit your head you're going to be hurt.' So he went out first and I followed him, but he helped me out by putting his arm in and helping me out the door.

\* \* \* \* \*

"Q. Did Mr. Helseth stay in that entranceway and help you out of that door?

"A. Yes, he did.

"Q. What happened to the door while he was helping you?

"A. He held the door open for me to get out.

"Q. And then what did the two of you do?

"A. Well, we walked up to this car he thought he was going to take me home in and he evidently reached and saw there were no keys, and he said, 'We can't take this. There's one in the garage. I'll take the demonstrator and take you home in the demonstrator.' He walked ahead of me again and I followed him, and of course we came through this same little door.

"Q. And what happened?

"A. He opened the door for me and helped me in.

"Q. How did he help you in?

"A. By taking my arm.

"Q. Did you lean upon his arm?

"A. Yes, I did.

"Q. Was this an easy door to go through?

"A. No, it wasn't.

"Q. Was it smaller than this size?

"A. Oh, definitely.

"Q. What did you have to do?

"A. I had to stoop down and see that my coat was gathered around me, and step up in order to get by."

Arrangements were made between Helseth and plaintiff that when her Buick was ready she would be called and someone from defendant's place of business would pick her up. On November 7 plaintiff was called by telephone and an employee of defendant picked her up at her home. The man who brought her to the garage parked the car in the lot to the rear of defendant's place of business, and they entered

the garage through the same pedestrian door which plaintiff had used the day before. Concerning this entrance she testified:

"Q. And when you got back to Whitaker Buick where did he park the car?

"A. At the rear of the garage.

"Q. That wasn't your car that he was driving?

"A. No sir, it was a Buick, a demonstrator.

"Q. This was a Buick too, but it wasn't yours?

"A. No.

"Q. When he parked the car in the rear of the building, was that the same lot that Mr. Helseth had tried to get a car from?

"A. Yes sir, it's the only lot, I guess.

"Q. And was that directly in back of the building?

"A. Yes.

"Q. And did he accompany you some place?

"A. He brought me through that door again.

"Q. And what did he do?

"A. Very nicely helped me through that door.

"Q. What did he do?

"A. Taking my arm and said, 'This is a bad thing. Watch yourself.'

"Q. And did you rely on him?

"A. I certainly did.

"Q. And did you get through that door all right?

"A. Yes.

"Q. And was it an awkward thing?

"A. Oh yes."

After some delay, plaintiff received her bill, totaling $93.65, paid it, and was told by a mechanic that her car was "out in the lot." She was handed her car keys. When asked what she did then, plaintiff said, "That's when I went out of the door, and knowing I had to go alone * * *." The witness said that she was about in the middle of the garage when the mechanic gave her the keys and that he pointed to the lot back of the building. She then started for the lot. She testified:

"Q. And as far as you were concerned how did you know the way to get to that lot?

"A. Because I had come in that door before.

"Q. In other words, this was the only door you knew about?

"A. That's what they told me. It was the only entrance to the back."

Plaintiff said that she then started for the little door; that she had about 15 or 20 feet to walk; and that she saw the white area and went out that door. When she opened it she saw it wasn't as big as she thought it was, so—

"* * * I had to stoop lowly to put my head out, and I raised my right foot, and this door was rather springy—it was pushing against my left side. So I gathered my coat around a little and I started to lift my foot out when I tripped on the ledge and fell terrifically forward on a cement driveway."

She said that she had her head and right foot out at that time and that she tripped on the ledge of the door and fell, striking her head on the concrete driveway.

On cross-examination, plaintiff testified generally in line with her direct testimony as to incidents leading up to her fall and said that she did not slip but that she tripped.

At the close of all the testimony, defendant moved for a directed verdict on the ground that plaintiff had failed to prove that defendant had been negligent and on the ground that plaintiff had been contributorily negligent as a matter of law. At that time plaintiff also moved for a directed verdict on the issue of liability. All motions were denied. The case was submitted to the jury, which returned a verdict for plaintiff. Thereafter, defendant moved for judgment notwithstanding the verdict, which motion was granted on the basis that defendant was not negligent and that plaintiff was contributorily negligent as a matter of law.

The legal issues raised by plaintiff on appeal are whether the evidence was sufficient to justify a finding that defendant was negligent and that its negligence was the proximate cause of plaintiff's injuries,

and whether the evidence justified a finding that plaintiff was contributorily negligent as a matter of law. Plaintiff assigned as error that the trial court erred in finding defendant free from negligence as a matter of law; in finding that plaintiff was contributorily negligent as a matter of law; and in excluding evidence of a qualified building and construction engineer that the pedestrian door did not conform with the usage and practice prevailing among service garages in the St. Paul area. ·

In a well-prepared memorandum made a part of his order, the trial judge went to great length to review pertinent evidence and explain and justify his position in reversing the findings of the jury. He stated that the facts pertaining to the issue of negligence, for all practical purposes, were undisputed; that they disclosed that there was no negligence on the part of defendant that proximately caused the accident; that they also disclosed that plaintiff was negligent or contributorily negligent and that her negligence was the proximate cause of her injuries and damages. The court then said, "Under these circumstances, there is no competent evidence reasonably tending to sustain the verdict."

Plaintiff argues on appeal that it is only where the evidence is so conclusive as to leave no room for differences of opinion among reasonable persons that the court is justified in granting judgment notwithstanding the verdict. She cites among her authorities Johnson v. Evanski, 221 Minn. 323, 327, 22 N. W. (2d) 213, 215, in which we said:

"Taking, as we must, the view of the evidence most favorable to the verdict, a motion for a judgment notwithstanding, whether based on negligence or on contributory negligence, should be denied unless the evidence in support of the verdict, and all reasonable inferences to be drawn therefrom, be so wholly incredible and unworthy of belief or so conclusively overcome by other uncontradicted evidence that the want of negligence or the presence of contributory negligence is so clear as to leave no room for an honest difference of opinion among reasonable men."

Plaintiff urges that the only question presented to the court on a motion for judgment notwithstanding the verdict is whether there is any

competent evidence reasonably tending to sustain the verdict, citing Majerus v. Guelsow, 262 Minn. 1, 113 N. W. (2d) 450.

Plaintiff also contends that she was a business invitee of defendant, which has been defined by this court as a—

"* * * person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them." Meyer v. Mitchell, 248 Minn. 397, 399, 80 N. W. (2d) 450, 452.

She contends that defendant is bound to exercise ordinary or reasonable care to keep its premises in a safe condition for those who come upon them by its express or implied invitation and that defendant's conduct was inferior to that of ordinary prudence. After describing the small door involved here, plaintiff argues that the standard of care requires that defendant maintain a door that is not a hazard and that the door used for the purposes referred to here should have been built through the wall of the building rather than being placed in the large garage door. It is her contention, therefore, that defendant had an affirmative duty to make the entrance through which it invites customers reasonably safe for that purpose and that the evidence did not justify a finding that she was contributorily negligent as a matter of law.

Defendant's obligation to plaintiff as a business invitee was that of due care. A shopkeeper is not an insurer of the safety of customers and is liable only for injuries resulting from his negligence. He is bound to exercise only reasonable care to keep his premises in a reasonably safe condition for his customers and others whom he invites, expressly or impliedly, to enter on business with him. Anderson v. Sears, Roebuck & Co. 223 Minn. 1, 26 N. W. (2d) 355.

In Lyon v. Dr. Scholl's Foot Comfort Shops, Inc. 251 Minn. 285, 290, 87 N. W. (2d) 651, 655, we said:

"An owner of a shop or store does not incur liability from the mere fact that one falls and is injured in his place of business. Damages can only be recovered if the keeper of the shop or store had been negligent and such negligence must be predicated on what one should have anticipated and not merely on what happened."

It will serve no useful purpose to go into a further detailed review of all of the evidence in the record before us. Plaintiff insists that it is sufficient to show that defendant was negligent; that its negligence was the proximate cause of plaintiff's injuries; and that she was not contributorily negligent. She cites Tierney v. Graves Motor Co. 185 Minn. 114, 239 N. W. 905, as contrary to defendant's position that, as a matter of law, it was not negligent in maintaining the pedestrian door involved herein for the use of its customers. The Tierney case was an action for damages for injuries sustained by plaintiff when she tripped and fell while going through a small door in defendant's garage. The trial court directed a verdict for defendant but later granted plaintiff's motion for a new trial on the ground of errors of law. On appeal, we held that whether plaintiff, whose automobile stopped on the street at 2 o'clock in the morning, was an implied invitee in going to defendant's nearby garage for gas or service was a question for the jury and the fact that defendant did not sell gas or furnish towing service did not, under the circumstances of that case, as a matter of law prevent plaintiff from being an invitee. We also held that the question of whether defendant was negligent in maintaining a small door constructed inside a large folding garage door, and made a part of it, so that it did not reach to the bottom of the door or the level of the sidewalk, and the question of plaintiff's contributory negligence in entering the door were for the jury. Although the Tierney case has some aspects similar to those of the case before us, it clearly is distinguishable and we do not consider it controlling here. In that case the door was not lighted so that one could see what kind of a door it was, and the only legend which appeared on the door was the word "PUSH." The plaintiff pushed upon it to gain entrance, and as it opened she fell or stumbled over the base of the large door and was injured. She had been in the garage before when she accompanied her husband on a mission personal to him, but there is no mention as to whether she had ever previously been through the door involved. In the instant case, it is undisputed that the area around the door was lighted; that there was a warning sign on the door; and that plaintiff had been assisted through the door on

three previous occasions and warned to be careful as it was a tricky door.

Defendant argues that it was not negligent and that there was conclusive evidence of plaintiff's contributory negligence. It cites Johnston v. Tourangeau, 193 Minn. 635, 259 N. W. 187, where we defined contributory negligence as want of ordinary or reasonable care on the part of a person injured by the negligence of another, directly contributing to the injury as a proximate cause. That case stated that it would be unfair that the whole burden of protective caution should be thrown on one of the two parties or that any man should be required to take better care for others than such persons are bound to take of themselves.

Even if we were to say under the evidence here that it might have been a jury issue as to whether defendant was negligent in not offering assistance to plaintiff on her last trip through the door when she fell or in not providing a safer door, we are still confronted with the question of her own contributory negligence. On her own direct testimony she stated that when she went through the door the first time with Mr. Helseth he told her to be careful, as it was a dangerous door; and that he helped her out by putting out his arm. When she went through the second time, he helped her in by taking her arm. She testified that it was not an easy door to go through as she had to stoop down, gather her coat around her, "and step up in order to get by." When she came to get her car on November 7, an employee of defendant helped her on her third trip through the door by taking her arm and telling her, "This is a bad thing. Watch yourself." With all of these experiences in going through the door, together with the warnings and caution signs, plaintiff attempted to use it for the fourth time and received her injuries. She made no request for assistance on that trip, although employees were present, nor was any assistance apparently offered her.

Regrettable as this unfortunate accident is, we are compelled to the conclusion that the decision of the trial court granting judgment notwithstanding the verdict must be affirmed. After all, it was the trial judge who heard the case, observed the witnesses, listened to all the

testimony, carefully reviewed the record in his memorandum, and still decided that the jury verdict could not stand.

Plaintiff offered evidence, which the trial court ruled inadmissible, that a door such as the one in the instant case is intended for the use only of employees as an "escape" door; that it is the custom and practice in this area to make available for the public a standard-size door leading into and out of the same general garage area; that it is the custom and practice of garages in the St. Paul area to have doors at least 6 feet 8 inches high and 3 feet wide, with a sill of not more than one-half or one inch, for the use of the public; and that the small door in this case did not conform to the usage and practice prevailing in garages in the St. Paul area. The evidence was excluded, inasmuch as it appears that it would have had no bearing on the question of negligence unless it were shown that this custom had been adopted for reasons of safety. In our opinion, no reversible error exists in connection with the trial court's ruling on that offered evidence.

Plaintiff also argues that she was agitated when she learned that her bill was $93.65 instead of $8, the amount she had in mind when she brought in the car for the winterizing service. While we are inclined to take judicial notice of a justified agitation on her part under those circumstances, we cannot say that defendant's conduct in that connection constituted negligence. It appears from the record that Helseth told her in the garage the day she brought her car in that they had the car apart and that it needed quite a bit of attention. That would indicate that she must have been alerted that defendant planned on doing more work on the car than just "winterizing" it. If defendant did not acquaint her with the possible cost of the extra work in this case, it would seem that good public relations required it to do so.

**Affirmed.**