## BETTY TRAIL v. VILLAGE OF ELK RIVER AND OTHERS.

175 N. W. (2d) 916.

March 26, 1970—No. 41440.

*Robins, Meshbesher, Singer & Spence, Ronald I. Meshbesher,* and *Morley Friedman,* for appellant.

*Carroll, Cronan, Roth & Austin,* and *Robert M. Austin,* for respondent village of Elk River.

*Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne,* and *O. C. Adamson II,* for respondent city of Anoka.

Heard before Nelson, Rogosheske, Sheran, Frank T. Gallagher, and Theodore B. Knudson, JJ.

THEODORE B. KNUDSON, JUSTICE.*

Appeal from an order of the District Court of Anoka County directing verdicts in favor of the defendant village of Elk River and defendant city of Anoka, both municipal corporations, and

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

from the judgment of the court in favor of each of said defendants.

In the early morning of Saturday, August 14, 1965, plaintiff, Betty Trail, was sleeping in the back seat of an automobile which was traveling in an easterly direction on Highway No. 10 in Anoka County. Two of her friends were in the front seat. The driver slowed for a stoplight, then accelerated as the light turned green. At that time another vehicle, driven by an intoxicated 20-year-old youth, Robert Ridlon, moving easterly on the same highway at what police estimated to be 100 miles per hour, struck the rear of the automobile in which plaintiff was a passenger. As a result of the accident plaintiff is probably crippled for life.

Plaintiff alleged in the original complaint that liquor purchased illegally at three municipal liquor stores was the cause of Ridlon's intoxication and that each store was liable to her for her injuries under Minn. St. 340.95, the Civil Damage Act, which creates a cause of action in favor of anyone injured by an intoxicated person against the party who, through an illegal sale, caused such intoxication.

At the conclusion of testimony by five witnesses for the plaintiff, only one of whom—Robert Ridlon—shed any light on the events which transpired in the period before the collision, the district court granted motions for directed verdicts for all three defendants [1] on grounds which can be analyzed intelligently only after a review of the facts—which are necessarily merely a summary of Robert Ridlon's testimony.

The narrative of events material to this litigation begins on Thursday morning, August 12, 1965. At about 10:30 a. m. Ridlon, Stephen Thurston, and David Zopfi arrived at the Coon Rapids home of apparently either Ridlon's or Thurston's girl friend. Mrs. Cole, the girl's mother, asked the youths to go to the liquor store to buy some beer. They complied. Zopfi, age 23, went into the Coon Rapids Liquor Store to make the purchase but was refused. A liquor store in Northdale Shopping Center, however,

---

[1] Plaintiff does not challenge the directed verdict in favor of the city of Coon Rapids.

did sell Zopfi "a case or two" of beer and a bottle of vodka. The youths returned to the Cole residence where they half asked, half demanded that Mrs. Cole give them some beer. In the first round of a prolonged, almost continuous alcoholic bout on the part of Ridlon and the crowd in which he traveled, the boys with some help from Mrs. Cole drank a whole case of beer, and Zopfi and Ridlon also drank the bottle of vodka. The girls present did not drink.

Later they stopped at Thurston's home and picked up a fifth of Seagram's V. O. and then headed for the Rum River where they stayed until the bottle was finished. They then went to the Anoka Municipal Liquor Store where Zopfi purchased two or three bottles of Seagram's 7.

After getting cocktail mix, the party headed for Spectacle Lake, where all but part of one bottle of the newly purchased whiskey was consumed. They left the lake area in the early morning, Ridlon arriving at his Anoka home at about 4 a. m. He immediately went to bed.

On the morning of Friday, August 13, Ridlon walked to Thurston's house, drank some coffee, and helped clean Thurston's automobile. Ridlon said that he and Thurston were sober. This sobriety is significant, at least in the case against the city of Anoka. They placed two-thirds of a fifth of Seagram's left from the previous night into the trunk of the automobile and headed for a local pool hall. They arrived there in the late morning and found Paul O'Keefe playing pool and drinking 3.2 beer. Ridlon played a few games of pool with Thurston, and when Thurston went home, Ridlon joined O'Keefe. The two played pool and O'Keefe continued to drink 3.2 beer until 4:30 p. m., when Ridlon went home to eat and change clothes. He returned to the pool hall at 5:30 p. m.; by then, according to Ridlon, O'Keefe had stopped playing pool and was simply drinking 3.2 beer. Thurston and Darrel Chapman arrived and, along with Ridlon, discussed where they would drink that night. Because they were going to use Chapman's automobile, they removed the bottle of whiskey from

Thurston's car and placed it in the trunk of Chapman's car. After stopping at the Cole residence to pick up Cheryl Cole, they went back to the pool hall to get O'Keefe (who was still drinking), apparently because they needed someone of age to purchase liquor for them. Throughout this part of Ridlon's testimony, the trial court ruled that his testimony that O'Keefe was drinking 3.2 beer was inadmissible; also, his opinion that O'Keefe talked "[l]ike he was intoxicated" was ruled inadmissible as a conclusion of the witness.

Soon after 8 p. m., O'Keefe was handed $9 with which to purchase liquor for the others. Ridlon stated that as O'Keefe went into the Elk River Municipal Liquor Store to make a purchase he was "unsure, deliberate, he thought about every step." His eyes had a "vacant look." Ridlon further testified that "[O'Keefe's] vocabulary was limited, his tongue was thick, he was stumbling over the words he had to say, it was slurred in a sense." When asked about O'Keefe's appearance, Ridlon responded: "Unkept, he was—His hair was hanging down, he was very unkept." In addition, Ridlon stated that O'Keefe smelled of beer, having spilled some on his sweatshirt. Up to this point Ridlon had not been drinking. O'Keefe purchased eight six-packs of malt liquor at the Elk River Municipal Liquor Store.

Ridlon consumed about twelve cans of the malt liquor and, when none was left, drank a small quantity of 3.2 beer which had been purchased at a private store and a "water glass full" (apparently undiluted) of the whiskey left from the Thursday night drinking bout. Soon after Ridlon's last drink, while he was in an undisputably intoxicated condition, the collision occurred.

After plaintiff's counsel informed the court at the close of Ridlon's testimony that no other witnesses would be called to corroborate Ridlon's version, the court directed verdicts for the defendants. The grounds for that decision seem to be (1) a reluctance to give credence to Ridlon's testimony because he was so obviously self-interested and because the expected testimony of others would be contradictory on essential points, and (2) a

reading of Minnesota statutory and case law which purportedly makes it legally impossible for a person to become intoxicated by drinking 3.2 beer. On appeal plaintiff and the defendant respondents have raised the following issues:

(1) Must the plaintiff show that the purchaser was obviously intoxicated or merely intoxicated?

(2) With respect to the cause of action against the village of Elk River, can a person become intoxicated, as the word is used in the relevant statutes, by drinking 3.2 beer?

(3) With respect to both actions:

a. Was any illegal sale made by the municipal liquor stores the cause of the injuries to Betty Trail?

b. Is evidence of a party's actions immediately before and after the purchase of liquor legally relevant to the question of what his condition was at the time of sale?

c. May a nonexpert testify as to a person's intoxication?

d. Was there such a lack of evidence that a directed verdict was justified?

We will discuss these issues in the order in which they have been raised.

■ The basic statutory grant of plaintiff's cause of action is Minn. St. 1965, § 340.95, which in relevant part provides:

"Every * * * person who is injured in person or property * * * by any intoxicated person, or by the intoxication of any person, has a right of action, in his own name, against any person who, by illegally selling * * * intoxicating liquors, caused the intoxication of such person, for all damages sustained * * *."

For a valid cause of action, a plaintiff must first show that the sale was illegal. Minn. St. 1965, § 340.14, subd. 1, provides in part:

"* * * No intoxicating liquor shall be sold, furnished, or delivered for any purpose to any person under the age of 21 years or to a habitual drunkard or *to any person obviously intoxicated*

or to any of the persons to whom sale is prohibited by statute or by reason of sale to whom a penalty is provided by statute * * *." (Italics supplied.)

This sentence was deleted from Minn. St. 340.14, subd. 1, by L. 1967, c. 19, § 10, which became effective after the accident but before trial. Plaintiff contends that Minn. St. 340.73 should apply because it has been in effect at all times relevant to this appeal and sets a standard which is more stringent (from the liquor seller's point of view) than Minn. St. 340.14, subd. 1.

Minn. St. 340.73, subd. 1, provides in part:

"It shall be unlawful for any person * * * to sell * * * any * * * liquors * * * to any minor person, * * * or *to any intoxicated person*, or to any public prostitute." (Italics supplied.)

Plaintiff claims that the defendants never should have relied on the less stringent law, which makes one who sells to an obviously intoxicated person—rather than a merely intoxicated person—subject to civil liability. There is some logical merit to this argument and to a suggestion that the two statutes can be read together;[2] however, we conclude that Minn. St. 1965, § 340.14, should be applied to this case. In Strand v. Village of Watson, 245 Minn. 414, 72 N. W. (2d) 609, we said that since § 340.14 became effective at a later date, in so far as the two statutes are inconsistent, § 340.14 repealed the inconsistent portion of § 340.73. Logically, then, only § 340.14 (at least in so far as it is inconsistent with § 340.73) was effective when this collision occurred. To apply § 340.73 in the instant case, rather than Minn. St. 1965, § 340.14, would be to give § 340.73 retroactive effect, contrary to Minn. St. 645.21. Further support for our conclusion is found in Minn. St. 645.35, which provides:

---

[2] See, Note, 46 Minn. L. Rev. 169, 187. This note also analyzes previous Minnesota cases including those dealing with the evidentiary questions which have arisen because of the apparent conflict between "intoxicated" persons and "obviously intoxicated" persons.

"The repeal of any law shall not affect any right accrued, any duty imposed, any penalty incurred, or any proceeding commenced, under or by virtue of the law repealed. Any civil suit, action, or proceeding pending to enforce any right under the authority of the law repealed shall and may be proceeded with and concluded under the laws in existence when the suit, action, or proceeding was instituted, notwithstanding the repeal of such laws; or the same may be proceeded with and concluded under the provisions of the new law, if any, enacted."

■ A more important question is whether one can become intoxicated by drinking 3.2 beer. This is of course relevant because O'Keefe was drinking 3.2 beer before he purchased the malt liquor from the Elk River Municipal Liquor Store. The trial court, in granting the motion for directed verdict, said that "the law does not define 3.2 beer as intoxicating liquor, it defines 3.2 beer as non-intoxicating."

As plaintiff points out, it is likely the trial court was relying upon Beck v. Groe, 245 Minn. 28, 70 N. W. (2d) 886, 52 A. L. R. (2d) 875. In that case two young men, one 21 and the other a minor, drank 3.2 beer at a ballroom in Austin. When they left, the minor, Groe, drove. He collided with a car driven by Beck. Plaintiff Beck sued the ballroom *for selling intoxicating liquor* to a minor. The Beer Act, §§ 340.01 to 340.06,[3] specifically regulated the sale of beer. It provides that the sale of 3.2 beer to a minor is illegal. However, we said, the rights under the Civil Damage Act "are not based upon the violation of a criminal provision of the liquor license laws, but arise under the provisions of the civil damage act when there is illegal selling, bartering, or giving *intoxicating liquor*" in violation of the law. 245 Minn. 37, 70 N. W. (2d) 893. We then concluded that 3.2 beer was not intoxicating *within the meaning of the statute making it unlaw-*

---

[3] The 1967 legislature changed this act in respects not relevant to the present dispute.

*ful to sell intoxicating liquors* to certain people, because the Minnesota Legislature has defined (in Minn. St. 340.07) intoxicating liquor as beverages containing in excess of 3.2 percent of alcohol by weight.

The issue in Beck was whether the sale of 3.2 beer to a person was actionable, not whether sale of admittedly intoxicating liquor to a person rendered intoxicated by the consumption of 3.2 beer is actionable. The legislature, as we have noted, for purposes of *sale* of certain liquids, has drawn a line classifying those beverages which contain more than 3.2 percent of alcohol by weight as intoxicating. It is improper to apply this classification in determining whether a person can become intoxicated on certain liquids because the original distinction was not made on the basis of a legislative assumption, either informal or after consideration of empirical evidence, that people who consume liquids with less than a 3.2 percent alcoholic content cannot become intoxicated. Nor did the laws regulating the sale of alcohol necessitate such a study. The purposes of the laws prohibiting the sale of certain beverages would not be advanced by transposing their definitions to this situation, and the purpose of the Civil Damage Act would be defeated if this were done.[4] However, when a person becomes in fact inebriated[5]—and counsel for respondent Elk River admitted on oral argument that one can become in fact intoxicated by drinking 3.2 beer—those provisions of our

---

[4] The author of the note in 46 Minn. L. Rev. 169, 174, made the following statement with reference to the purpose of the Civil Damage Act: "* * * [T]he conclusion recently reached by the Court of Appeals of the Eighth Circuit [in Village of Brooten v. Cudahy Packing Co. 291 F. (2d) 284, 293] that the ultimate purpose of the Minnesota CDA is a dual one—to suppress the mischief and advance the remedy—is a proper determination."

[5] The Supreme Court of Illinois in Osborn v. Leuffgen, 381 Ill. 295, 298, 45 N. E. (2d) 622, 624, took cognizance of the fact of such intoxication when it said: "Beer is an alcoholic liquor, and it is a matter of general knowledge that all alcoholic liquors are intoxicating in varying degrees."

laws which prohibit further sale of intoxicating liquor to him are applicable.

■ To recover, plaintiff must show that there was a causal connection between the illegal sale and the infliction of injuries. As to the sale by the village of Elk River, plaintiff may be able to meet the causation requirements which this court has established. This is not true of the Anoka sale. It must be recalled that on Thursday, Zopfi, allegedly in an intoxicated state, purchased the whiskey which was supposedly partly consumed by Ridlon late Friday night or early Saturday morning. Between those events, Ridlon, Thurston, and Zopfi had all attained sobriety. In Kvanli v. Village of Watson, 272 Minn. 481, 484, 139 N. W. (2d) 275, 277, we said:

"* * * [T]o establish liability under § 340.95 there must be a practical and substantial relationship between (a) the circumstances making the sale illegal, and (b) the circumstances accounting for the consumption of the liquor by the one whose intoxication caused damage. For example, there would be no such relationship between a sale illegal because made to an obviously intoxicated adult and consumption of the liquor by another adult who received it from the purchaser after he had regained sobriety."

Whatever relationship existed between the sale and later use of the liquor, it was too tenuous to support a conclusion that there was a causal connection. The order directing a verdict for the city of Anoka is affirmed.

However, the malt liquor was purchased from the Elk River Municipal Liquor Store the same night as the collision. And Ridlon soon after the purchase consumed twelve cans, probably more than a sufficient quantity to render a person quite intoxicated. That malt liquor may not have been the only source of intoxication is immaterial. In Murphy v. Hennen, 264 Minn. 457, 463, 119 N. W. (2d) 489, 493, this court said:

"* * * We have held that intoxicants consumed as a result of illegal sales need not be the sole cause of intoxication. It is enough if such intoxicants combine with other intoxicants that may have been legally sold or furnished to be a concurring or proximately contributing cause."

It is also unimportant that O'Keefe was not the one who inflicted the injuries. Liability under the Civil Damage Act is not limited to cases where the purchaser causes the damage. Kvanli v. Village of Watson, 272 Minn. 481, 483, 139 N. W. (2d) 275, 277; Benes v. Campion, 186 Minn. 578, 581, 244 N. W. 72, 73; Murphy v. Hennen, 264 Minn. 457, 462, 119 N. W. (2d) 489, 492.

■ O'Keefe's actions immediately before and after the purchase were relevant to the issue of O'Keefe's appearance when he made the purchase. In Strand v. Village of Watson, 245 Minn. 414, 423, 72 N. W. (2d) 609, 616, we said:

"* * * Proof necessarily need not be positive by eyewitnesses. In 2 Wigmore, Evidence (3 ed.) § 235, we find the following statement:

" 'Intoxication, as a mental condition of temporary stupefaction, may be evidenced circumstantially in the same general modes that are available (*ante,* § 227) for mental capacity or condition in general:

" '(1)   It may be evidenced by the person's conduct.

" '(2)   It may be evidenced by *predisposing circumstances, i. e.* by the drinking of intoxicative liquor.

" '(3)   It may be evidenced by his *prior or subsequent condition* of intoxication within such a time that the condition may be supposed to be continuous.'

"Circumstantial evidence may help to establish the essential fact, but there must be evidence from which it reasonably may be inferred that the essential fact did exist."

■ If Ridlon or anyone else in the company of O'Keefe that night had an opportunity to observe O'Keefe, that person can testify as to O'Keefe's intoxication. It is an exception to the

opinion rule that nonexperts can give their opinion concerning another's intoxication. The foundation for such opinion is observation of the allegedly intoxicated party's appearance, breath, manner of walking or standing, and manner of speech. State v. Simonsen, 252 Minn. 315, 328, 89 N. W. (2d) 910, 918; State v. Peterson, 266 Minn. 77, 123 N. W. (2d) 177; Clarke v. Philadelphia & Reading Coal & Iron Co. 92 Minn. 418, 100 N. W. 231.

■ The last question we must answer is whether there was such a lack of evidence in plaintiff's favor that a directed verdict was justified. While it may be true, as the trial court intimated, that Ridlon is so interested in implicating others and his testimony reveals such an unusually acute recollection of the facts and so articulate a presentation of them at trial that this testimony can be seriously questioned, and while it may be true that upon a new trial other witnesses may contradict Ridlon on essential points, we cannot say that fair-minded men would not place some reliance on Ridlon's testimony, which is internally consistent, and that they could not disagree on a verdict. The court may not substitute its judgment on a question of fact—which a witness' credibility certainly is—for that of the jury. Moreover, when one party moves for a directed verdict, there must be admitted for the purposes of the motion the credibility of the evidence for the adverse party and every inference which may be fairly drawn from such evidence.[6] Majerus v. Guelsow, 262 Minn. 1, 113 N. W. (2d) 450.

The order directing a verdict for respondent Village of Elk River is vacated and the cause remanded to the district court for a new trial as to it.

Affirmed in part, reversed in part.

---

[6] On the subject of the standard applied in considering a motion for a directed verdict, see, generally, 2B Barron and Holtzoff, Federal Practice and Procedure (Rules ed.) § 1075; 5 Moore, Federal Practice (2 ed.) § 50.02; 19 Dunnell, Dig. (3 ed.) § 9764.